Ezra WATERS, Plaintiff-Appellant,

v.

Clinton CHAFFIN, etc., et al.,
Defendants-Appellees.

No. 81–7779.

United States Court of Appeals,
Eleventh Circuit.

Sept. 3, 1982.

Haynie & Willis, Douglas R. Haynie, Marietta, Ga., for plaintiff-appellant.

Susan B. Forsling, Franklin N. Biggins, Franklin & Axam, Atlanta, Ga., for defendants-appellees.

Before VANCE, JOHNSON and HENDERSON, Circuit Judges.

VANCE, Circuit Judge:

In this appeal we must decide whether a policeman may be disciplined for intemperately criticizing the police chief in front of another police officer while off-duty. We conclude that under the peculiar circumstances of this case a policeman may not be disciplined for such conduct. We therefore reverse the judgment of the district court and remand for further proceedings.

I

Appellant Ezra Waters was a captain in the Fulton County Police Department until his dismissal on February 1, 1979. In April and May 1978 the department was investigating Waters for a number of undisclosed reasons. As part of the investigation, Margie S. Lawrence, a secretary and deputy sheriff in the department's narcotics division, telephoned Waters on May 2, 1978 for an undisclosed purpose. Later that day Waters called Lawrence back and asked her to meet him after work at a local cocktail lounge, which she agreed to do.

Waters and Lawrence met at Jerald's Lounge, in Cobb County, at approximately 4:30 in the afternoon. Both officers were off-duty and in civilian clothes and, of course, both were outside the jurisdiction of the Fulton County Police Department. Waters had several drinks in the ninety minutes the two were at the bar[1] and during the conversation he disparagingly referred to Chief of Police C.O. Chester several times. Specifically, he complained that he could not say anything to Sergeant A. L. Korey without "that son-of-a-bitch" Chester finding out about it. Waters also called Chester a bastard and said that Chester was "as sorry as they come and nothing but a back stabbing son of a bitch." After she left the bar, Lawrence immediately returned to her office and prepared and filed a report describing the incident.

Nothing came of the incident for nearly nine months, during which time Chief Chester resigned from the department.[2] On January 28, 1979, however, Waters was ordered to report the next morning to Acting Chief of Police Louis Graham. When Waters arrived at Graham's office he received written notice of discharge, which detailed eight allegations of misconduct.[3] One of the charges was for insubordination stemming from the name-calling that had occurred at Jerald's Lounge. Waters denied the truth of the factual allegations, but this response did not satisfy Graham. He informed Waters of his right to appeal the discharge to the Fulton County Personnel Board, and the discharge became effective on February 1, 1979.

---

1. There is testimony indicating that Waters had seven drinks at Jerald's Lounge. The amount of alcohol consumed by Waters is of limited relevance to the first amendment issue in this case, however, and the district court made no finding as to this allegation.

2. Although Chester took a medical retirement, there was some debate over the exact reasons he left the department. The record is unclear on this point, except that it shows that Chester's departure was not related to problems with Waters.

3. The eight allegations of misconduct involved three separate incidents and were as follows:

*January 9, 1978*
   (1) Waters suggested to Lawrence that she earn money as a cocktail waitress and prostitute;

(2) Waters asked Lawrence if she ever considered selling her body;
   (3) Waters admitted to Lawrence that he knew of two instances in which "certain VIP's" had engaged the services of prostitutes and that he had not reported the information;

*May 2, 1978*
   (4) the incident at Jerald's Lounge;
   (5) Waters became intoxicated in public;

*October 7, 1978*
   (6) Waters ridiculed Chester before two police officers other than Lawrence while on duty;
   (7) Waters tried to induce two police officers to gamble as to who would succeed Chester as chief of police; and
   (8) Waters was intoxicated in public.

Waters appealed his discharge to the personnel board in timely fashion. The board heard evidence regarding the discharge at five sessions before issuing its order on May 16, 1979. The personnel board absolved Waters of all charges against him, except the insubordination charge based on Rule 3–1 of the department's regulations.[4] The board determined, however, that discharge was too harsh a punishment, and it ordered Waters reinstated in another department within Fulton County at an appropriately lower graded classification.[5]

Shortly thereafter, Waters filed this lawsuit in the United States District Court for the Northern District of Georgia. Waters alleged that the disciplinary action taken by the police department violated his rights under the first amendment.[6] After a bench trial the district court first rejected the department's affirmative defense that the demotion was the result of a settlement between Waters and the department.[7] Reaching the merits of the first amendment claim, however, the court determined that "governmental regulation of the speech of public employees will generally be appropriate . . . [as to] speech which does not involve matters of public interest." *Waters v. Chaffin*, Civ. No. C79–1934A, at 5 (N.D.Ga. Aug. 31, 1981). The court accordingly held that Waters' derogatory comments about Chief Chester were not constitutionally protected and that the disciplinary action did not infringe Waters' first amendment rights.

## II

It is axiomatic that governmental employment may not be conditioned upon

---

**4.** Rule 3–1 of the Fulton County Police Department regulations provides:

> *Rule 3–1. Insubordination.* Failure or deliberate refusal of any member or employee to obey a lawful order given by a superior officer shall be insubordination. Ridiculing a superior officer or his orders, whether in or out of his presence, is also insubordination.

**5.** The order of the personnel board read as follows:

> ORDER
>
> The Personnel Board, during sessions convened on March 21, 1979, April 12, 1979, April 19, 1979, April 26, 1979, and May 2, 1979, considered all of the testimony and evidence presented by the parties at interest in the above styled case.
>
> Based upon all of the testimony and evidence heard during these sessions, the Personnel Board finds in favor of the Appointing Authority on the allegation made by the Appointing Authority relative to insubordination. However, due to mitigating circumstances and after careful consideration of all pertinent factors involved, the Board orders and directs that the following actions be taken:
>
> A. That Ezra L. Waters be reinstated in another department within Fulton County in an appropriate lower graded classification and position in the Classified Service, effective as of the date of this Order.
>
> B. That such position shall be of a type that his membership in the Georgia Peace Officers Association may be continued without interruption.
>
> C. That the salary of such position and the incumbent shall be as nearly comparable as possible to the Appellant's salary at the time of his separation.
>
> D. That all time lost since the date of his separating on February 1, 1979, shall be considered as suspension without pay, until the date of his reinstatement.
>
> E. That full credit shall be given for all prior service with Fulton County with no loss of seniority, pension or any other fringe benefits, except for any adjustments that may be necessary as a result of the aforementioned suspension.
>
> F. That all records and testimony taken in this case shall be sealed and filed with the official records of the Personnel Board.

**6.** Waters predicated his claim upon 42 U.S.C. § 1983. The district court had jurisdiction of the case pursuant to 28 U.S.C. § 1343(3). We have appellate jurisdiction over the district court's final order. 28 U.S.C. § 1291.

**7.** The police department challenges this finding, and contends that overwhelming evidence established that Waters agreed to the demotion in exchange for the scaling down of the charges against him. The district court, however, found as a matter of fact that no settlement had been reached. The district court's finding rested in part upon credibility determinations which we are unable to reevaluate. We therefore cannot say that the district court's finding was clearly erroneous. *See* Fed.R.Civ.P. 52(a). This finding narrows considerably the case as it comes to us, and compels us to evaluate the case as if the department had no other possible basis for disciplining Waters except the three profanities uttered against Chief Chester.

the relinquishment of constitutional rights. *Wilson v. Taylor*, 658 F.2d 1021, 1027 (5th Cir. 1981). As the Supreme Court has stated, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967), *quoted in Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). This rule applies to public employees who exercise their first amendment rights of free speech: "every public employee is *largely* free to express his views, in public or private orally or in writing." *Abood v. Detroit Board of Education*, 431 U.S. 209, 230, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977) (emphasis added).[8] Despite the fact that public employees do not relinquish the protections of the first amendment by accepting a job with the government, their rights are somewhat less extensive than those shared by the citizenry at large. Simply, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1734. In any particular case when a public employee speaks out, then, it is necessary to strike the proper balance between the interest of that employee in speaking freely and the interests of the state, as an employer, in promoting the efficient delivery of public services. *Id.; see Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973); *Wilson v. Taylor*, 658 F.2d at

1027; *Bickel v. Burkhart*, 632 F.2d 1251, 1256 (5th Cir. 1980).

That the employee who speaks out is a police officer does not mean that the balance is always struck in favor of the state. "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); *see Wilson v. Taylor*, 658 F.2d at 1027; *Gasparinetti v. Kerr*, 568 F.2d 311, 315 & n.16 (3d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 903 (1978); *Kannisto v. City & County of San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Muller v. Conlisk*, 429 F.2d 901, 904 (7th Cir. 1970); *Flynn v. Giarrusso*, 321 F.Supp. 1295, 1298 (E.D.La.1971). Nonetheless, courts have recognized that the state's interest in regulating its police force can be especially compelling. "To the extent that being a policeman is public employment with unique characteristics, the right of the employee to speak ... may be more or less limited. It is not, however, destroyed." *Muller v. Conlisk*, 429 F.2d at 904; *see Wilson v. Taylor*, 658 F.2d at 1027; *Byrd v. Gain*, 558 F.2d 553, 554 (9th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *cf. Bickel v. Burkhart*, 632 F.2d at 1257 (high stakes of firefighting necessitates greater operational efficiency and, therefore, courts weigh the state's interest in regulating speech of firemen more heavily); *Davis v. Williams*, 617 F.2d 1100, 1104 (5th Cir.) (en banc) (vagueness and overbreadth challenge in context of fire department's disciplinary regulations less persuasive), *cert. denied*, 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980).

▪ In determining whether a public employee was disciplined unconstitutional-

---

**8.** The first amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech or of the press...." The free speech clause of the first amendment has been incorporated into the fourteenth amendment and held applicable against the states. *See, e.g., NAACP v. Claiborne Hardware Co.*, — U.S. —, —, n.43, 102 S.Ct. 3409, 3423 n.43, 73 L.Ed.2d 1215

ly,[9] the court must apply the test enunciated by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The employee has the initial burden of demonstrating that his speech was constitutionally protected and was a substantial or motivating factor in the decision to discipline him.[10] If the employee meets this twin burden, the burden of proof shifts to the government to show by a preponderance of the evidence that it would have reached the same decision to discipline the employee in the absence of the protected speech. *Id.* at 287; *see Givhan v. Western Line Consolidated School District,* 439 U.S. at 415, 99 S.Ct. at 696; *Avery v. Homewood City Board of Education,* 674 F.2d 337, 340 (5th Cir. 1982); *Paschal v. Florida Public Employees Relations Commission,* 666 F.2d 1381, 1384 (11th Cir. 1982). In this case the department stipulated that the sole reason for Waters' demotion was the insubordination evinced by the incident at Jerald's Lounge. The sole question presented, therefore, is whether Waters' speech was constitutionally protected.

### III

■ Waters, like every citizen, has a strong interest in having the opportunity to speak his mind, free from government censorship or sanction. *See Abood v. Detroit Board of Education,* 431 U.S. at 234–35, 97 S.Ct. at 1798; *Police Department v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Although the actual

words Waters spoke cannot be said to be valuable to the public at large, the first amendment's protections do not turn on the social worth of the statements, save in a few exceptions not relevant here. *See, e.g., Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Similarly, that Waters chose to express his ideas in language some might find offensive is not, in and of itself, enough to override his interest in speaking freely. *See Spence v. Washington,* 418 U.S. 405, 412, 94 S.Ct. 2727, 2731, 41 L.Ed.2d 842 (1974); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969); *Wiegand v. Seaver,* 504 F.2d 303, 307 (5th Cir. 1974), *cert. denied,* 421 U.S. 924, 95 S.Ct. 1650, 44 L.Ed.2d 83 (1975); *Clary v. Irvin,* 501 F.Supp. 706, 709 & n.9 (E.D.Tex.1980).

■ In addition to Waters' fundamental interest in speaking as he chooses, he has an interest in being free from unnecessary work-related restrictions while off-duty. Waters spoke the words at issue after he had left work, while he was out of uniform, while he was out of the department's jurisdiction, and to a person he considered a friend. We think it quite reasonable that he assumed he could vent a little steam over drinks, and we think that Waters, like everyone, has a legitimate interest in maintaining a zone of privacy where he can speak about work without fear of censure. *Cf. Wilson v. Taylor,* 658 F.2d at 1029–30 (police officer has legitimate interest in off-

(1982); *Fiske v. Kansas,* 274 U.S. 380, 386–87, 47 S.Ct. 655, 657, 71 L.Ed. 1108 (1927).

**9.** That Waters was ultimately demoted and transferred rather than discharged is irrelevant. The first amendment is implicated whenever a government employee is disciplined for his speech. *See, e.g., Swilley v. Alexander,* 629 F.2d 1018, 1021 & n.3 (5th Cir. 1980) (letter of reprimand and threat of restricted duties); *Yoggerst v. Stewart,* 623 F.2d 35, 39 (7th Cir. 1980) (verbal reprimand and letter in personnel file); *Simpson v. Weeks,* 570 F.2d 240, 242 (8th Cir. 1978) (transfer and poor evaluation), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979); *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 117–18 (1st Cir. 1977) (transfer).

**10.** Determining whether an employee's speech or conduct is constitutionally protected is a question of law, so we are not bound by the district court's application of the *Pickering* test to this case. *See Bickel v. Burkhart,* 632 F.2d 1251, 1256 (5th Cir. 1980). Conversely, proof of causation under *Mt. Healthy* is a question of fact, and we are bound by the clearly erroneous rule when reviewing the district court's finding on that issue. *See Van Ooteghem v. Gray,* 654 F.2d 304, 305 (5th Cir. 1981) (en banc), *cert. denied,* —— U.S. ——, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982); *Bickel v. Burkhart,* 632 F.2d at 1255 n.7. This case does not present any causation question, however, for the parties stipulated that Waters was fired for ridiculing Chief Chester.

duty dating of known felon's daughter). It must be remembered that we are talking about off-duty shoptalk, which, although regrettably indiscreet and tactless, is nonetheless basically idle barroom chatter. Such conversation generally is not subject to sanction. See Wiegand v. Seaver, 504 F.2d at 306; Egger v. Phillips, 669 F.2d 497, 503–04 (7th Cir. 1982); Yoggerst v. Stewart, 623 F.2d 35, 40 (7th Cir. 1980); Clary v. Irvin, 501 F.Supp. at 709 n.9. We do not doubt that the department may restrict the actions of its off-duty officers in many ways, but it does not follow that these off-duty restrictions may unnecessarily impinge upon private, social conversation.[11]

11. The district court was of the view that the first amendment was not even applicable to Waters' statements because these statements did not concern a matter of public interest. In support of this "litmus test" approach, the district court relied upon a recent decision of another circuit, Key v. Rutherford, 645 F.2d 880, 884 (10th Cir. 1981). See also Schmidt v. Fremont County School Dist. No. 25, 558 F.2d 982, 984–85 (10th Cir. 1977) (statements dealing with internal matters of school system "do not invoke First Amendment protection").

The district court apparently thought that Key was a fifth circuit case and therefore binding precedent. The former fifth circuit has, however, rejected this restrictive view of the first amendment. In Williams v. Board of Regents, 629 F.2d 993, 1003 (5th Cir. 1980), cert. denied, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981), the court stated:

Although it has been often stated that First Amendment protection is not dependent upon the "social worth" of ideas, see Police Department of Chicago v. Mosley, 408 U.S. 92, 96 [92 S.Ct. 2286, 2290, 33 L.Ed.2d 212] (1972); Stanley v. Georgia, 394 U.S. 557, 564 [89 S.Ct. 1243, 1247, 22 L.Ed.2d 542] (1969); Terminiello v. Chicago, 337 U.S. 1, 4 [69 S.Ct. 894, 895, 93 L.Ed. 1131] (1949), the nature of the communication is relevant to the balancing of the interests of the employee as citizen against the interest of the governmental unit.

Accord Henrico Prof. Firefighters Ass'n, Local 1568 v. Board of Supervisors, 649 F.2d 237, 246 (4th Cir. 1981); Foster v. Ripley, 645 F.2d 1142, 1148 (D.C.Cir.1981); Cooper v. Johnson, 590 F.2d 559, 562 (4th Cir. 1979).

Binding precedent aside, we think that the position adopted in Key and Schmidt is untenable. The thrust of the Key rule is that an employee's speech may be suppressed on the basis of its content without regard to the state's interest in banning such speech. It is, however, a fundamental tenet of first amendment jurisprudence that content based restrictions on speech are almost invariably impermissible absent a particularized inquiry demonstrating that a compelling state interest outweighs the citizen's interest in speaking freely. See, e.g., Police Dep't v. Mosley, 408 U.S. at 96, 92 S.Ct. at 2290. Only a few situations have arisen in which content based restrictions will be upheld because the speech falls into a particular category of unprotected speech, or, as the district court put it, fails a content based

litmus test. See, e.g., New York v. Ferber, —— U.S. ——, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (nonobscene child pornography); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (malicious libel); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words). Statements by public employees that do not deal with matters of public concern do not fall within any of these categories, and we refuse to extend this rightly narrow list by holding that they do.

Having determined that the district court incorrectly viewed the significance of the nature of the speech at issue, we nonetheless conclude that in many cases the public interest in the speech is relevant as one factor in the Pickering analysis. See, e.g., Foster v. Ripley, 645 F.2d at 1148 ("under Pickering and Mt. Healthy, one factor relevant in weighing the side of the balance favoring the employee is the interest served by his speech"); Kannisto v. City & County of San Francisco, 541 F.2d 841, 843 (9th Cir. 1976) ("[a]lso weighing in the balance along with [the] individual right is the right of the public to be informed") (citing Pickering).

In this case, however, the public's interest in the speech at issue is at best remote. The public has little interest in an individual's uncouth deprecations of his superior, so the public's right of access to information, cf. Globe Newspaper Co. v. Superior Court, —— U.S. ——, ——, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982) (public and press have first amendment right of access to criminal trials); First Nat'l Bank v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (statute restricting corporation's right to publicize its viewpoint on political issue violates public right to receive information), is not implicated in this case. It is true that the public has a generalized interest in an individual's right to be able to speak freely, but this interest is no more than a restatement of Waters' already articulated interest. Additionally, the public has a strong interest in the efficient delivery of governmental services. Because the public does not have an interest in this case that is distinct from the interests advanced by the parties, the Pickering balance must turn solely on the respective weights of the interests that Waters and the department possess.

Absent significant countervailing governmental interests, we are loathe to sanction the intrusion of the government's ear into the private lives of its employees.

The department argues that its interests outweigh those of Waters because the verbal sniping by Waters raises a real "question of maintaining [both] discipline by immediate superiors [and] harmony among co-workers." *Pickering v. Board of Education*, 391 U.S. at 570, 88 S.Ct. at 1735. The department contends that Waters' comments necessarily interfered with the close working relationship between Chief Chester and Waters, who was one of seven captains in the department. Additionally, the department argues that Waters' comments to a subordinate officer injected dissension into the force and threatened to undermine the department's chain of command.

We agree with the department that it has a "substantial interest in developing 'discipline, *esprit de corps*, and uniformity' . . . to insure adequate 'promotion of safety of persons and property.'" *Kannisto v. City & County of San Francisco*, 541 F.2d at 843 (quoting *Kelley v. Johnson*, 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976)); *see Wilson v. Taylor*, 658 F.2d at 1027; *Barrett v. Thomas*, 649 F.2d 1193, 1198–99 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982); *Aiello v. City of Wilmington*, 623 F.2d 845, 855 (3d Cir. 1980); *cf. Bickel v. Burkhart*, 632 F.2d at 1257 (fire department, like police department, has greater interest than normal government employer in maintaining morale and discipline); *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17, 26 (2d Cir. 1979) (same conclusion). When a police department can show that the speech in question actually disrupts the officer's efficiency or the internal operation of the department or

that the speech has the reasonable tendency to lead to such disruption, we hesitate to substitute our judgment for that of the department.[12] *See Barrett v. Thomas*, 649 F.2d at 1198–99; *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1018 (D.C.Cir.1977); *Kannisto v. City & County of San Francisco*, 541 F.2d at 843.

We do not believe, however, that the department's asserted justifications for disciplining Waters apply with full force in this case. Two factors in particular significantly undermine the asserted interference with the close working relationship of Waters and Chester. First, at the time of the comments and thereafter, Waters and Chester did not work together closely. Waters was on assignment to the Georgia Bureau of Investigation (GBI) for almost a year prior to the incident in question and reported directly only to a GBI officer; the evidence indicates that Waters ran into Chester at most a few times a week. Consequently, the "relationship does not appear to be of the type to call for . . . holding back from faultfinding." *Clary v. Irvin*, 501 F.Supp. at 711. Similarly, the long delay between the incident and the notice of discharge belies the argument that the comments actually had an adverse effect on the department. Had they disrupted the police force or led to dissension in the ranks, Waters would have been fired immediately. As we have stated, the reasonable possibility of adverse harm will generally be enough to invoke the full force of judicial solicitude for a police department's internal morale and discipline. In cases like this, however, where delay has belied what once was a reasonable expectation of harm, such solicitude is unwarranted. Because the court must "make individualized and searching review of the factors asserted by the em-

---

**12.** The District of Columbia circuit has indicated that the state must demonstrate that the governmental unit suffered actual harm before an employee may be disciplined for his speech. *Tygrett v. Barry*, 627 F.2d 1279, 1282 (D.C.Cir. 1980). We think this approach fails to protect the government's interest in the efficient delivery of police services. Because lives are often at stake, the danger of harm to a police depart-

ment's discipline is too great to insist on waiting for the harm to result. *See Priest v. Secretary of the Navy*, 570 F.2d 1013, 1018 (D.C.Cir. 1977). Consequently, we conclude that a reasonable likelihood of harm generally is also enough to support full consideration of the police department's asserted interests in restricting its employees' speech.

ployer," *Tygrett v. Barry*, 627 F.2d 1279, 1283 (D.C.Cir.1980); *see Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979), we will not allow a generalized concern to overshadow the realities of the case. The asserted disruption in the close relationship between Chester and Waters appears to be more apparent than real in this case, and it does not weigh heavily in support of the disciplinary action taken. We also think that the department's concern over the fact that Waters' comments were directed to a subordinate officer is too general to justify its position. Lawrence was not in Waters' chain of command, for she was assigned to the metropolitan narcotics unit while Waters was assigned to the GBI. Consequently, any claim of a real or threatened breakdown in the department's command structure is attenuated and the asserted governmental interest is substantially weaker than if Lawrence had reported to Waters.[13]

**13.** The department relies heavily on *Kannisto v. City & County of San Francisco*, 541 F.2d 841 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977), to support its position that Waters' speech was without constitutional protection. In *Kannisto* the ninth circuit upheld the suspension of a police lieutenant who described his superior as an " 'unreasonable, contrary, vindictive individual' whose behavior was 'unreasonable, belligerent, arrogant, contrary and unpleasant,' " *id.* at 842, while addressing subordinates during morning inspection. If faced by the facts of *Kannisto*, we would have little hesitation in reaching the same result as the ninth circuit. The facts of this case, however, are in sharp contrast to those of *Kannisto*. We have an off-duty, out-of-uniform officer talking to one person over drinks in the next county. Additionally, in this case there was a time lag that tended to undermine the department's contentions of disruption, whereas in *Kannisto* the San Francisco Police Department took immediate and reasonable prophylactic measures to ensure that no disruption would occur. In sum, we find *Kannisto* distinguishable from this case and insufficient authority to support the department's position.

**14.** Waters has raised three other contentions on appeal. He first contends that the personnel board violated his due process rights by failing to hear and consider evidence concerning his case. The record belies this contention, however, as it shows that the board heard testimony regarding his discharge at five different meetings.

We conclude that the department's interests do not outweigh those of Waters, and that his speech was constitutionally protected. We must emphasize, however, the narrowness of our decision. On one side, we have an off-duty police officer who was merely bellyaching about his job over drinks. On the other hand, we have a police department whose asserted interests in suppressing the speech do not fully withstand scrutiny. Because we do not think that the department has made a showing of actual harm or a reasonable likelihood of harm to its efficiency, discipline, or harmony, we believe that the first amendment protects this example of "the American tradition of making passing allusion to the vicissitudes of the boss." *Yoggerst v. Stewart*, 623 F.2d at 40. Because the only asserted basis for the disciplinary action was the statements, we hold that the demotion and transfer was unconstitutional.[14]

Waters also argues that Rule 3–1 is impermissibly vague. A law or regulation is unconstitutionally vague only if, in all of its possible applications, it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) (quoted in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, ⸺ U.S. ⸺, ⸺, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)); *see also City of Mesquite v. Aladdin's Castle, Inc.*, ⸺ U.S. ⸺, ⸺, 102 S.Ct. 1070, 1074–76, 71 L.Ed.2d 152 (1982). It strains credulity to argue that the restriction on ridiculing a superior officer is vague under this standard.

Finally, Waters contends that Rule 3–1 is unconstitutionally overbroad. We do not decide this issue, but we believe we should point out two considerations that weaken this contention. First, the Supreme Court has recently held that for purposes of overbreadth analysis there is no distinction between "pure speech" and expressive conduct. *New York v. Ferber*, ⸺ U.S. ⸺, ⸺, 102 S.Ct. 3348, 3353, 73 L.Ed.2d 1113 (1982). Consequently, Waters must prove that the alleged overbreadth of Rule 3–1 is " 'not only ... real, but substantial as well, [when] judged in relation to the [regulation's] plainly legitimate sweep.' " *Id.* at ⸺, 102 S.Ct. at 3353 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973)). Second, the former fifth circuit has determined that the government has greater latitude in formulating

We do not decide whether reinstatement is an appropriate remedy in this case. That decision is for the district court in the first instance. Accordingly, we reverse and remand for further proceedings.

REVERSED and REMANDED.

personnel regulations governing police and fire departments than it might otherwise have. *See Davis v. Williams*, 617 F.2d 1100, 1103–05 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980).