Harry Leon JOYNER, Plaintiff,

v.

Manly LANCASTER, individually and in his official capacity as Sheriff of Forsyth County; and the County of Forsyth, a public body corporate, Defendants.

No. C–82–765–WS.

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

Dec. 23, 1982.

Jim D. Cooley and David C. Pishko of Pfefferkorn & Cooley, Winston-Salem, N.C., for plaintiff.

Bynum M. Hunter and Ben F. Tennille of Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., and P. Eugene Price, Jr., Forsyth County Atty., Winston-Salem, N.C., for defendants.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, Chief Judge.

On July 9, 1982, plaintiff Harry Leon Joyner filed a complaint against defendants Manly Lancaster and Forsyth County in which plaintiff alleges that the defendant Lancaster discharged him from employment in the Sheriff's Department because of his support of Lancaster's opponent in a Democratic Party primary election campaign. Plaintiff seeks relief under 42 U.S.C. § 1983. This matter is now before the Court upon plaintiff's Motion for Preliminary Injunction (July 9, 1982). Plaintiff requests reinstatement to his former position in the Sheriff's Department pending the determination of this case. The parties presented testimony and exhibits at a hearing on November 29, 1982, and oral arguments on December 8, 1982. The parties also submitted evidence in affidavit form.

### FINDINGS OF FACT

1. The Forsyth County Sheriff's Department (Department) employs approximately 160 people, 157 of whom are deputized, and approximately 36 reserve deputies. In the spring of 1982 the command officer staff included one major and five captains, three of whom command Patrol Divisions. Each Patrol Division is on duty daily during one of three shifts. Subordinate to the captains are several lieutenants who are also command officers.

2. Clement Manly Lancaster, a defendant, began employment as a deputy in 1950 and was elected sheriff on the Democratic Party ticket in 1970. The citizens of the county re-elected Lancaster as sheriff in 1974, 1978, and 1982. The office of sheriff is created by Article VII, Section 2 of the North Carolina Constitution. The sheriff has the exclusive right to hire, supervise, and discharge employees in his office, ex-

cluding the hiring of close relatives. N.C. Gen.Stat. § 153A–103.

3. Harry Leon Joyner, the plaintiff, was employed as a deputy in the Department in May, 1962, by Sheriff Ernie Shore. While Shore was sheriff plaintiff attained the rank of senior deputy.

4. Soon after becoming sheriff in 1970 Lancaster adopted a military-type rank system in the Department and assigned the rank of lieutenant to plaintiff because he was a senior deputy. On or about May 1, 1974, Lancaster promoted plaintiff to the rank of captain primarily because of plaintiff's seniority in the Department.

5. The parties dispute the scope of the duties of a captain. As a captain plaintiff was the immediate commanding officer of a Patrol Division, a unit of approximately 16 men. In this capacity plaintiff was the "watch commander" when his division was on duty and would be the highest ranking deputy on duty during the two evening shifts. At the hearing plaintiff denied participating in policy or procedure making, but admitted that his job involved the implementation of procedure and that at times he had to exercise independent judgment. Plaintiff also stated that an outline of duties of a captain in the Department prepared in 1979 by the North Carolina Institute of Government was accurate ((Affidavit of Manly Lancaster, Attachment (September 3, 1982) (hereafter Lancaster Affidavit)).

The Court finds that the position of captain was a command level, policymaking position. Captains are responsible for planning and directing patrol division activities and must make frequent independent decisions. Lancaster Affidavit, Attachment. Captains supervise and evaluate the work of subordinates and must work closely with other supervisory personnel. Also, patrol division captains direct the Department's response to emergencies. Lancaster Affidavit, Attachment; Deposition of Clement Manly Lancaster at 101 (December 7, 1982) (hereafter Lancaster Deposition). Lancaster's testimony provides a thorough description of a captain's duties. Captains are the sheriff's communication links with the deputies in the field. The sheriff relies on the captains to advise him when making employment decisions and to inform him of problems and solutions to problems within the Department. Lancaster states that he confides in the captains by telling them confidential information regarding contemplated changes in policy or procedure. Lancaster Affidavit ¶¶ 6 & 7. Captains are essential in implementing new policy or procedure. Affidavit of G.R. Dillon ¶ 6 (November 29, 1982) (hereafter Dillon Affidavit). Others testified about the confidential nature of a captain's duties and his role in policymaking and implementation. Affidavit of E.D. Alston ¶¶ 3 to 7 (September 3, 1982) (Alston is a Patrol Division captain). J.W. Seivers, a captain, stated in an Affidavit (September 3, 1982) (hereafter Seivers Affidavit) that plaintiff attended command level meetings at which internal problems and policy and procedures changes were discussed. Trust and confidence must also exist among the command officers. Affidavit of E.P. Oldham ¶ 6 (September 3, 1982) (Oldham is a lieutenant).

6. Since the position of sheriff is an elected one and command level officers such as captains are privy by the very nature of their duties to confidential information about the internal affairs of the Department, such officers are in a position where at least the potential exists to use this information for partisan political purposes. Sheriff Paul H. Gibson of Guilford County, North Carolina, persuasively testified that a sheriff must be able to trust his officers not to so abuse their positions. Affidavit ¶¶ 2 and 4 (September 3, 1982). This situation is particularly significant because the captain's duties include representing the sheriff in dealing with civic groups and the general public. Lancaster Affidavit, Attachment.

7. Around November, 1981, plaintiff learned that Robert Woods, a friend, planned to challenge Lancaster in the Democratic Party primary election. At that time plaintiff intended to support and vote for Lancaster.

8. In November, 1981, plaintiff discussed the upcoming election with Lancaster. Plaintiff told him that he and some other deputies would support Woods if Lancaster did not run. Complaint ¶ 7 (verified by plaintiff). Lancaster revealed his plan to run for re-election and his thoughts about retiring mid-term and being succeeded in office by someone within the Department selected by vote of the deputies and appointed by the Board of County Commissioners. Plaintiff expressed his feeling that he could support no one within the Department as a successor.[1]

9. Between November, 1981, and March, 1982, plaintiff decided to vote for Woods but not publicly support him.[2]

10. On May 8, 1982, plaintiff received a standard annual pay raise. Plaintiff's Hearing Exhibit # 1. While serving as a captain plaintiff received standard (cost-of-living) pay raises and no merit pay raises. Dillon Affidavit ¶ 2; Lancaster Affidavit ¶ 8.

11. In early May, 1982, J.W. Seivers, captain of the Department's Criminal Investigation Division, asked plaintiff bluntly if he supported Woods. Plaintiff responded affirmatively. Seivers severely criticized plaintiff for this decision, describing it as an act of disloyalty. Deposition of Harry Leon Joyner at 16–17 (December 7, 1982) (hereafter Plaintiff's Deposition); Complaint ¶ 8; Seivers Affidavit ¶ 9. This incident caused plaintiff to publicly campaign on Woods' behalf since he felt his job was in jeopardy. Plaintiff's Deposition at 17.

12. Seivers, not plaintiff, reported this incident to Lancaster. Lancaster instructed Seivers and others that he "could take" plaintiff's campaigning and discouraged them from confronting or approaching

plaintiff about Woods. Seivers Affidavit ¶ 9; Lancaster Deposition at 120.

13. In May, 1982, Major Dillon, the second in command in the Department, asked deputies for contributions for Lancaster's campaign and for signatures on a petition supporting Lancaster. Plaintiff refused the request. Although Lancaster testified at the hearing that he permitted Dillon to do this and instructed him to tell the deputies that the request was not mandatory, this activity violated the County Code since the solicitation occurred on government property during working hours. Complaint ¶ 9. Consequently, Lancaster ordered Dillon to refund the money contributed.

14. The refunding of the contributions precipitated a mandatory meeting of the deputies at a skating rink in Kernersville, North Carolina. Lancaster testified that he addressed the gathering but could not remember his remarks. Plaintiff testified that Lancaster told the assembled deputies of his awareness of the lack of 100% support within the Department for his re-election and his lack of concern about it. Complaint ¶ 10. Carl Parrish, an attorney, renewed Dillon's previous requests and plaintiff again declined them.

15. In May and June, 1982, plaintiff publicly campaigned for Woods. He talked with civilian acquaintances about Woods and helped distribute campaign literature and posters, but engaged in neither activity while on duty or in uniform. However, plaintiff participated in frequent conversations at the Department about the campaign. Complaint ¶ 11; Plaintiff's Deposition at 31. Several deputies testified that he never tried to pressure them into supporting Woods. Affidavits of Lee T.

---

1. Lancaster could not recall this conversation. Lancaster testified at the hearing that he confided in some close people. However, Lancaster also informed Sergeant Terry E. Ford, a deputy in plaintiff's division, Ford's wife, Julian Tyler, a police officer visiting from England, and Tyler's wife of these retirement plans. Affidavit of Terry E. Ford ¶ 7 (November 29, 1982). The evidence tends to show that the conversation with plaintiff in fact occurred.

2. Plaintiff gave inconsistent reasons for this decision. At the evidentiary hearing he attributed it to Lancaster's retirement plans, but in his deposition he testified that he made the decision in March, 1982, after learning about overly lenient treatment of a Sergeant Goforth inconsistent with a prior disciplinary action. Deposition of Harry Leon Joyner at 20–23 and 34 (December 7, 1982) (hereafter Plaintiff's Deposition).

Shelton ¶ 7; Ednee M. Gaylor ¶ 7; Terry E. Ford ¶ 7; Douglas K. Cesario ¶ 7; Alexander J. Niforos ¶ 7; F. Ray Bottoms ¶ 3 (November 29, 1982). Lancaster testified that he received reports that plaintiff was attempting to wrongly influence the votes of some deputies.[3] Lancaster Deposition at 112–113 and 119.

16. On election day, June 29, 1982, plaintiff, while off duty and in civilian clothes, solicited support for Woods outside the Old Richmond School polling place. Lancaster came there and briefly discussed voter turnout with plaintiff. Complaint ¶ 12.

17. Lancaster won the June 29 primary.

18. On July 6, 1982, plaintiff met Lancaster at Department headquarters and asked to speak with him. The ensuing conversation was interrupted by a phone call. Plaintiff testified that he sought to talk to Lancaster then in order to explain why he had supported Woods and that he had begun to explain the Seivers' incident when the phone rang. Lancaster testified that he thought plaintiff was attempting to force him into deciding then and there to fire plaintiff or assure him that his captaincy was safe.

When plaintiff returned to Lancaster's office to resume their conversation he was confronted by the sheriff and Oldham, the internal affairs officer, who was operating a tape recorder. Lancaster testified that he used a tape recorder whenever he discharged an employee. Lancaster began by telling plaintiff that he had thought about him much "since last week and all" and requested plaintiff's resignation. Plaintiff's Hearing Exhibit # 2. Plaintiff refused to resign. Lancaster stated that he no longer wanted plaintiff to represent him, giving no reason except to say that it would be best for the Department. Lancaster discharged plaintiff the next day when plaintiff again refused to resign.

19. Plaintiff filed this lawsuit on July 9.

20. Lancaster discharged plaintiff because his campaign activities on Woods' behalf, directly or indirectly, made it impossible for Lancaster to give plaintiff the necessary trust and confidence a commanding officer must enjoy if he is to perform all his duties properly. Lancaster testified about other factors which influenced or *might have* influenced his decision. Any contention that past poor job performance decisively motivated the discharge on July 6, one week after a bitter election, is improbable. Although Lancaster stated that he decided a year earlier to fire plaintiff during a future reorganization of the Department, he also candidly admitted that lack of loyalty contributed to his decision to fire plaintiff.[4] Lancaster Deposition at 6–7.

---

3. Such testimony is improper as hearsay if considered for the truth of the matter asserted in the reports. Fed.R.Evid. 801(c). It is proper as proof of receipt of the reports or as proof of what Lancaster believed about plaintiff's activities.

4. Lancaster testified to several reports of job deficiencies prompting his decision to discharge plaintiff on July 6 as well as his earlier decision to discharge plaintiff upon some future reorganization of the Department. The illness of the county's personnel director had caused a delay of the reorganization and Lancaster had not earlier fired plaintiff because of feelings of loyalty to plaintiff's uncle, Walter Speas, who had helped Lancaster obtain a deputy's position in 1950. Lancaster Deposition at 75–76. However, the political nature of the discharge manifests itself in Lancaster's hearing testimony that the July 6 firing resulted in part from Speas' breach of a political confidence, *i.e.,* Speas told the media of Lancaster's early retirement plans.

Reports of deficiencies in plaintiff's performance testified to by Lancaster included plaintiff's resistance several years ago to Lancaster's decision to switch the work schedule to a rotating shift system, his refusal to assist in serving civil processes and resistance on one occasion to complying with a Department rule concerning wearing the uniform hat, his refusal to address civic groups, his failure to maintain proper morale in his division manifested by several transfer requests by division deputies, showing favoritism, making derogatory remarks about Lancaster, gruffness, and plaintiff's cover-up of a deputy's wrongdoing. No deficiency resulted in any written reprimand. Although Lancaster testified that he had orally reprimanded plaintiff about 10 or 12 times over the past five years, most of these deficiencies resulted in no type of disciplinary action. Moreover, Lancaster repeatedly could only describe reports of these deficiencies in the most vague, uncertain, and general terms much less recall when he heard the reports. In some

21. Although Lancaster received no report that plaintiff had failed to carry out any duty (Lancaster Deposition at 113 & 115), he received numerous reports during and after the campaign about harmful effects to the Department of plaintiff's campaign activity. One deputy, who, along with three others, sought to transfer out of plaintiff's division, reported that plaintiff tried to influence him to vote for Woods and that he felt intimidated to comply. Lancaster Deposition at 59, 64, 113, and 118. He received several reports from different sources that plaintiff was telling others that it was "time for a change." Lancaster Deposition at 110–111. Most serious were the numerous reports he received that plaintiff's activities had generated a significant morale problem within the Department. Lancaster Deposition at 114–122. Over two dozen deputies including Dillon, Oldham, Blakely, Sergeant Barker, and Deputies Thomas and Jones requested plaintiff's removal. Lancaster also learned that deputies, especially the officers, feared loss of their jobs if Woods won. Lancaster believed these reports as well as comments by command officers that they could no longer work co-operatively with plaintiff. Lancaster Deposition at 132; Lancaster Affidavit ¶ 10; Oldham Affidavit ¶ 7; Seivers Affidavit; Dillon Affidavit ¶ 5.

22. Lancaster and command officers believe that plaintiff's disloyalty to Lancaster adversely affected most of the men in the Department. Lancaster has irretrievably lost all trust and confidence in plaintiff. Consequently, Lancaster and command officers believe that plaintiff could no longer function effectively within the Department. Although plaintiff filed affidavits of several deputies formerly in his division wherein they basically state that plaintiff's campaigning caused no problem and that his reinstatement would cause no problem and while Lancaster presented scant evidence of disruption apart from inadmissible hearsay, nonetheless Lancaster has shown that plaintiff's capacity to function as a command

officer has become fatally eroded as a result of his politics. Simply stated, a command officer cannot exist as an island within the Department.

23. Plaintiff has not been re-employed. He has applied for jobs at Wachovia Bank and Trust Co., a local airport, and the Winston-Salem Police Department. He has been offered a security job in Mocksville paying $4.25 per hour. Currently, he is drawing around $166.00 weekly in unemployment compensation and this benefit will expire in about 9 or 10 weeks. Plaintiff's Deposition at 65. He withdrew his retirement fund amounting to $14,900 and received payment from the county for unusued vacation. When discharged as a captain plaintiff was earning about $1,033.00 every two weeks. Plaintiff's wife earns $60.00 to $70.00 weekly.

## DISCUSSION AND CONCLUSIONS OF LAW

 Plaintiff seeks preliminary injunctive relief. Fed.R.Civ.P. 65. In this Circuit, "the trial court standard for interlocutory injunctive relief is the balance-of-hardship" test. *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir.1977). The balance-of-hardship test turns upon the flexible interplay of four factors: (1) the probable irreparable harm to plaintiff without an injunction, (2) the harm to defendant if an injunction issues, (3) the likelihood of plaintiff prevailing on the merits, and (4) the public interest. The interplay of the first two factors influences the third. In *Johnson v. Bergland*, 586 F.2d 993 (4th Cir.1978), the Court succinctly described this interplay.

The court may properly consider probability of success on the merits and should always take the public interest into account. However, the most important factors "are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a

instances Lancaster was unsure what bearing, if any, a deficiency had on the July 6 decision. This vagueness is compelling evidence that the

reports of deficiencies were not at the forefront of Lancaster's July 6 decision.

decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success."

586 F.2d at 995, *quoting Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d at 196. If the balance is decidedly in plaintiff's favor, then he need only show that grave or serious questions are presented. The need for the plaintiff to show likelihood of success on the merits takes on real significance or increases as the balance of harm nears equipoise and does not clearly favor plaintiff. *Maryland Undercoating Co. v. Payne,* 603 F.2d 477, 481 (4th Cir. 1979); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d at 195–196. Finally, the Court must consider the public interest in preserving the *status quo ante litem* until a trial court can consider the merits of the controversy.

The plaintiff contends that without preliminary injunctive relief he will suffer unemployment and loss of a career in law enforcement and also claims automatic entitlement to injunctive relief because of denial of his First Amendment rights to free speech and association. In presenting the latter contention plaintiff argues that the Court need not examine the possible harm to the defendants if the injunction is granted because violations of such rights constitute per se irreparable harm. Plaintiff's argument is too simplistic.

Proven impairments of First Amendment rights even for minimal periods of time can constitute irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547, 565–66 (1976). In *Elrod,* the Court held that employees who were discharged for political reasons were entitled to a preliminary injunction without otherwise proving irreparable harm because they had demonstrated a likelihood of success on the merits. 427 U.S. at 373–74, 96 S.Ct. at 2689–90, 49 L.Ed.2d at 565–66. *Accord Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir.1981). A finding of irreparable injury must, therefore, depend at a minimum on the probable soundness of plaintiff's allegations of violation of constitutional rights and not merely on the allegations. *Delaware & Hudson Railway Co. v. United Transportation Union,* 450 F.2d 603, 619–20 (D.C.Cir.1971), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Determining whether plaintiff has sufficiently shown this type of harm must await development of the plaintiff's chances of success on the merits.

Also, contrary to plaintiff's argument, the Court considers it erroneous to focus only upon possible harm, irreparable or not, to plaintiff. The trial court must look at the likelihood of irreparable harm to the defendants if the injunction issues and balance that harm against possible harm to plaintiff without an injunction. *Maryland Undercoating Co. v. Payne,* 603 F.2d at 482. In *Johnson v. Bergland,* 586 F.2d 993, the Fourth Circuit dealt with a claim of violation of rights of free speech and association. Although the court stated that such a violation would be *per se* irreparable injury, the court nonetheless analyzed the harm to the defendants if an injunction should issue. Finding that the harm to defendants would be insubstantial and non-prejudicial, the court concluded that the injunction should issue since plaintiff had demonstrated the presence of grave or serious questions.

Plaintiff asserts that the balance-of-hardships nonetheless weighs in his favor because he has lost his employment during hard economic times and his career in law enforcement. In analyzing the potential harm to plaintiff the Court is guided by the Supreme Court's language in *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Although the Supreme Court recognized the real possibility of exceptions, it stated that generally "an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributed to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." 415 U.S. at 92 n. 68, 94

S.Ct. at 953 n. 68, 39 L.Ed.2d at 187–188 n. 68.

Plaintiff has not found new employment, although he has submitted applications to three possible employers and has received an offer of employment in a security position in Mocksville. He will receive during the next two months unemployment compensation and has already received sizeable payments in the form of unused vacation pay and his retirement fund. If plaintiff prevails ultimately any relief would be designed to make whole any losses caused by the discharge. The Court is not aware of any impending threat of loss of home or farm by plaintiff or post-discharge punitive actions by defendants against plaintiff. Under these circumstances and in light of the holding in *Sampson,* the Court believes that plaintiff's loss of income and present inability to find new employment fail to show the type of irreparable harm necessary to justify the issuance of a preliminary injunction. As noted in *Sampson,* such injuries are common to most discharged employees and are not attributable to any peculiar action by defendants in discharging plaintiff.

Plaintiff had served as a deputy for 20 years prior to his discharge. This fact, loss of plaintiff's career or livelihood, cannot be overlooked. Plaintiff is now faced with the prospect of being unable to pursue his career for an indefinite period. Loss of career must be weighed against the possible harm to defendants if an injunction issues.

■ The evidence discloses that reinstatement of plaintiff would very likely create an intolerable situation within the command structure of the Department. Lancaster and command officers distrust plaintiff and have no confidence in him. The evidence disclosed that the duties of captain necessitate a close working relationship between plaintiff and Lancaster and other command officers. As a captain, plaintiff would need to know confidential information about internal affairs of the Department. This lack of harmony is a real, current problem and not one merely anticipated by Lancaster and others. This harm to defendants significantly counterbalances

plaintiff's loss of income and career. *Cf. Simmons v. Stanton,* 502 F.Supp. 932, 936 (W.D.Mich.1980). Caution must be exercised in issuing an injunction in such a situation, lest the Court unduly interfere with the capacity of this law enforcement agency to carry out its vital function. *Waters v. Chaffin,* 684 F.2d 833, 836 (11th Cir.1982); *Vargas v. Chardon,* 405 F.Supp. 1348, 1353 (D.P.R.1975).

As noted above, plaintiff may be entitled to an injunction if he shows irreparable injury to his constitutional rights by demonstrating a sufficient probability of success on the merits. Since the balance-of-harm, absent the plaintiff's allegation of irreparable injury to his First Amendment rights, is near equipoise or tipped in defendants' favor, the Court must evaluate the extent of plaintiff's prima facie showing of likelihood of success on the merits. Of course, the Court definitely does not decide plaintiff's chances for success on the merits just as its findings of fact are tentative and only for purposes of ruling on this motion.

Plaintiff alleges that Lancaster fired him because he campaigned publicly on behalf of Lancaster's primary election opponent. Lancaster fired plaintiff because, directly or indirectly, his campaign activities made it impossible for Lancaster and other officers to trust or confide in him.

■ Under state law the sheriff has the exclusive right to fire any deputy in his office. N.C.Gen.Stat. § 153A–103. Deputies work at the pleasure of the sheriff. However, government employees including sheriffs can neither impose unconstitutional conditions upon public employment such as requiring employees to relinquish their rights of free speech and association nor discharge employees for a constitutionally infirm reason. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Barrett v. Thomas,* 649 F.2d 1193, 1199 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982). The protection of the First Amendment does not reign unlimited. In some circumstances, an employee's First Amendment

interests may be required to bow to the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. at 568, 88 S.Ct. at 1735, 20 L.Ed.2d at 817. The trial court's duty is to balance these competing interests.

In order to succeed on the merits plaintiff must establish that his campaign activities were constitutionally protected and that these activities were a substantial or motivating factor in his discharge. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Waters v. Chaffin,* 684 F.2d at 837; *Wren v. Jones,* 635 F.2d 1277 (7th Cir.1980), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981); *Tanner v. McCall,* 625 F.2d 1183, 1190 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). If plaintiff succeeds on these issues, then the question arises whether defendant has presented evidence that he would have discharged plaintiff regardless of the protected conduct. "If the first amendment motive is not the 'but for' reason for the refusal to reappoint plaintiffs, their section 1983 action fails." *Tanner v. McCall,* 625 F.2d at 1195.

Lancaster admitted that plaintiff's political activity was a factor in his decision to discharge him. It appears that plaintiff could likely succeed on the issue of whether his politics was a motivating factor in his discharge. The next issue is whether his political activity was constitutionally protected. Resolution of this issue calls into play the balancing process announced in *Pickering. Barrett v. Thomas,* 649 F.2d at 1200–1201; *Wren v. Jones,* 635 F.2d at 1286–1287.

In *Elrod* the Supreme Court held that a "nonpolicymaking, nonconfidential government employee cannot be discharged . . . from a job that he is satisfactorily performing upon the *sole* ground of his political beliefs." 427 U.S. at 375, 96 S.Ct. at 2690, 49 L.Ed.2d at 566 (Stewart, J., concurring); *see also Ramey v. Harber,* 589 F.2d 753 (4th Cir.1978), *cert. denied,* 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979); *McCollum v.*

*Stahl,* 579 F.2d 869, 872 (4th Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979) (plaintiff is dischargeable at will if he was *not* simply a menial employee or *not* merely a nonpolicymaking, nonconfidential employee). Under the holding in *Elrod* plaintiff would appear to have only a slim possibility of success on the merits, since as a high command officer he is a policymaking, confidential employee.

The Supreme Court modified this analysis in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Supreme Court both broadened and narrowed the rule in *Elrod* as follows:

[P]arty affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.

In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

445 U.S. at 517–518, 100 S.Ct. at 1295, 63 L.Ed.2d at 583–584. Essentially, *Branti* establishes a functional test, as opposed to the *per se* or *de facto* test in *Elrod,* which recognizes as fundamental to the democratic process not only free speech and association but also the need that policies of an elected official, such as Lancaster, not be threatened or jeopardized from within the organization, *i.e.,* the Department. It is these policies which the electorate presumably sanctioned by electing the official. *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The court in *Nekolny* described the *Branti* test as "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or

their implementation." 653 F.2d at 1170. Where differing political beliefs of a person have the potential to undermine the ability of that person to perform his duties fully or his ability to serve his employer to the employer's legitimate satisfaction, then political affiliation becomes an appropriate requirement for the effective performance of the office. The issue is not whether the duties and powers conceivably could be exercised by qualified persons irrespective of their political affiliation, but whether differing political persuasions predictably could thwart the implementation of policies of an elected official. *Ness v. Marshall,* 660 F.2d 517, 521 (3d Cir.1981); *Brunton v. United States,* 518 F.Supp. 223, 239 (S.D. Ohio 1981).

The functional analysis announced in *Branti* parallels the analysis provided in *Pickering. Tanner v. McCall,* 625 F.2d at 1189–1190. Where political affiliation is likely to cause an official, especially a high-ranking official, to be ineffective in performing the duties of his office, then a dismissal for that reason would not be constitutionally infirm. *Ness v. Marshall,* 660 F.2d 517; *Nekolny v. Painter,* 653 F.2d 1164; *Serna v. Manzano,* 616 F.2d 1165 (10th Cir.1981); *Brunton v. United States,* 518 F.Supp. 223. The burden is on the employer at trial to demonstrate that "political support or affiliation is relevant or essential to the job." *Tanner v. McCall,* 625 F.2d at 1190.

The evidence presented by Lancaster which plaintiff weakly challenged strongly indicates that political affiliation is an appropriate requirement for a captain's position. Plaintiff serves as an advisor and a planner and has broad functions in the Department. Lancaster is an elected public official. He is responsible directly to the electorate alone for the performance of the Department. Substantial influence over the Department's performance is precisely the power which a captain can exercise. Sloppy Department performance necessarily plays into the hands of Lancaster's political opponents, in whose ranks plaintiff stands. If plaintiff was entitled to retain his job, then Lancaster would have to suffer the presence of an active political antago-

nist in a confidential, policymaking position. Clearly, substantial disharmony existed between plaintiff and Lancaster and others at the time of the discharge. Without the trust or confidence of his superiors and peers in the Department the plaintiff cannot be expected to fully perform all the duties of his office or exert anything other than a negative influence on the Department. The Court perceives that plaintiff could have no better than a fifty-fifty chance of success on the merits.

The final factor for consideration is the public interest. Generally, the public interest is in preserving the status quo until the issues can be fully litigated. The preservation and vindication of the free exercise of First Amendment rights is also an important interest. However, the public also has an interest in the efficient performance of its law enforcement agencies. *Waters v. Chaffin,* 684 F.2d at 836. The former interest does not so predominate the latter as to mandate granting interlocutory equitable relief.

IT IS, THEREFORE, ORDERED that plaintiff's motion for a preliminary injunction be, and the same hereby is, DENIED.