**FOR PUBLICATION**

## In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13728

_____

TERRY JOYNER,

*Plaintiff-Appellant,*

*versus*

CITY OF ATLANTA,
CHIEF GEORGE TURNER,
VAN HOBBS,

   in their individual capacities,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-01780-RDC

_____

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Terry Joyner worked as a police officer with the City of Atlanta Police Department (APD). He was denied a promotion to Captain in December 2014, and he was moved from a flexible to a fixed schedule in October 2015. He filed a lawsuit claiming that the City through his former supervisors — Police Chief George Turner, Major Earnest Finley, and Major Van Hobbs — engaged in racial discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq*.; that Turner and Hobbs retaliated against him in violation of the First Amendment; and that the City through Turner and Hobbs retaliated against him in violation of the Georgia Whistleblower Act, Ga. Code Ann. § 45-1-4.

Joyner lost all of his claims on summary judgment or at trial. This is his appeal from the judgment against him. He loses it, as well, except that we reverse the grant of summary judgment to Turner and Hobbs on his First Amendment retaliation claim.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Facts

Joyner was hired as a police officer with the APD in 1992. APD officers rank in the following ascending order: Police Officer, Senior Police Officer, Investigator, Sergeant, Lieutenant, Captain, Major, Deputy Chief, Assistant Chief, and Chief. Joyner was promoted to Investigator in 1999, Sergeant in 2001, and Lieutenant in 2007. He was not promoted again.

Joyner worked in the APD's Field Operations Division (FOD), which, while he was working in it, was divided into six geographic patrol zones. Each zone was led by one Captain and one Major.

1. In February 2008, Joyner Reported
   Allegations of Racial Discrimination.

In February 2008, Joyner, who is White, was working in Zone 3 under Major Earnest Finley, who is Black.[1] On February 12, 2008, Joyner met with Finley to inform him that some White officers had told Joyner that they believed Finley was treating them less favorably than he was treating Black officers. Joyner testified during his deposition that Finley was so angry when Joyner told him that "[Joyner] felt like [Finley] was about to hit [him]," and that Finley screamed something like, "Why are you doing this?"

Finley requested that Joyner investigate those allegations and send any documentation directly to Finley. But Joyner understood from a friend with the Office of Professional Standards (OPS) that he needed to refer the matter to that office instead of investigating it himself. So Joyner informed OPS of the allegations, and at a second meeting sometime later in February he told Finley that he was involving that office. Finley admitted in his deposition

---

[1] The record sometimes uses racial identifiers like "White" and "Caucasian" interchangeably, and "Black" and "African-American" interchangeably. For consistency, except when quoting the record, we will use the terms "White" and "Black," instead of any synonyms.

that Joyner "did the right thing" in this situation, that the complaint "should have been forwarded to OPS right away."

Also present at both of Joyner's February meetings with Finley was Lieutenant Scott Lyle, the assistant commander of Zone 3. Joyner testified that after the second meeting, Lieutenant Lyle told him: "[Y]ou really need to watch your back, because [Finley is] someone that holds a grudge, and he's going to come after you forever."

> 2. Between February and March 2008, Finley Changed Joyner's Schedule to Night Watch, but Joyner Requested and Received a Transfer to a New Zone.

On or about February 20, 2008, Finley changed Joyner's schedule, transferring him from patrol day watch to patrol evening watch, effective February 28.

Unhappy with that schedule change, Joyner filed an internal grievance against Finley with Deputy Chief Peter Andresen asserting that the schedule change was unlawful retaliation. Joyner testified that Andersen said his grievance was a "slam dunk" because the schedule change never should have happened. To resolve the grievance, Andresen allowed Joyner to transfer out of Zone 3 and into Zone 2. That did resolve the matter. Because Joyner was moved out of Zone 3, the schedule change Finley had ordered that Joyner did not want never went into effect.

> 3. Between 2010 and 2014, Joyner's Supervisors Saw Problems with his Performance.

Over the next couple of years, Joyner had some performance problems.  In 2010 he failed to appear for court when he was subpoenaed to testify against a suspect.

In February 2012, George Turner, the Police Chief at the time, appointed Joyner to lead the fugitive squad.  Erika Shields was Deputy Police Chief while Joyner held that position.  She testified that Turner put Joyner in charge of that unit because "he wanted to give Joyner an opportunity to shine."   Turner similarly testified that he appointed Joyner to this position "because I really believed that he was on the right track, that we needed him to show his professionalism, his ability to accomplish a task in a very challenging assignment."

But Joyner let them down.  Joyner and Shields attended the weekly Command Operating Briefing to Revitalize Atlanta (acronym: COBRA) meetings, where Joyner gave updates on his unit's status and productivity.  Shields testified that the fugitive squad was underperforming under Joyner, who was often unprepared for those meetings.  Turner similarly testified that he had been "an advocate for Lieutenant Joyner," but that he "was absolutely disappointed [with him]" based on his work with the fugitive squad.

In December 2012 Joyner used his work email account to email a man who was having an affair with Joyner's wife.  He told the man: "I hope you're having fun f'ing my wife." The APD investigated the incident and cited Joyner for sending that email from his work email address.

In June 2014 Joyner received a performance rating of 3.9/5, which meant his performance was "effective," but not either of the two higher performance ratings: "highly effective" or "outstanding." Shields testified that "effective" was "pretty much" the lowest evaluation that officers generally received.

Turner testified that other commanders wanted him to move Joyner out of the fugitive squad. Because of Joyner's performance, in August 2014 he was transferred out of that unit and back into Field Operations Division Zone 2.

After returning to Zone 2, Joyner did not get along with Van Hobbs, the Major in charge of it. Without being asked, Joyner informed Hobbs that he was not going to run Hobbs's criminal investigation division unit for him because he had already served as the unit's commander in that Zone twice. Hobbs did not like that; he thought it was arrogant of Lieutenant Joyner to tell a Major what to do with his Zone.

Hobbs testified at trial that while serving as a Lieutenant in Zone 2, Joyner made some decisions that caused "issues." Specifically, Zone 2 was large (40 square miles), and it was divided into two geographic "sectors." Officers were assigned to patrol only one sector. Joyner flipped those assignments; he "transitioned all the A sector officers into B sector and all the B sector officers into A sector." Because the officers were less familiar with their new areas within the large Zone and didn't know the back streets, their response times to crimes increased. Hobbs informed Turner that Joyner's decision was the reason for the increased response times.

4. In December 2014, Turner Promoted Four Lieutenants to Captain, and Joyner Was Not One of Them.

On December 24, 2014, Chief Turner signed a personnel order appointing four Lieutenants to Captain, effective January 1, 2015. At that time, there were about 70 qualified Lieutenants and a total of only six Captain positions, one for each patrol Zone. Joyner was not promoted to Captain.

As Police Chief, Turner was the sole decisionmaker under the Atlanta City Code for appointments to Captain or higher. He personally appointed every person who reached those positions during his time as Chief. He testified at trial that when considering officers for promotions, he took into account "their education, their work performance, their level of engagement throughout the entire police department, and their ability to accomplish a certain task that [he] was trying to fill."

Turner did not use an application process or conduct interviews when deciding whom to appoint to higher-ranking positions. But he had "regular conversations" with Lieutenants and Sergeants about their career goals. For example, another man testified that because he was interested in being promoted from Lieutenant to Captain, he scheduled a meeting with Turner to go over his resume. And he received the promotion in the December 2014 personnel order, the one involved in this case. Joyner, by contrast, was not that proactive. He did not reach out to Turner to show his interest in being appointed to Captain.

Some parts of Chief Turner's testimony at trial indicate that he took into account the races of officers under consideration for promotions. Turner agreed that when replacing the "select number" of Captain positions that were occupied by an African American Captain, he was "looking for the most qualified African-American lieutenant." In those cases, a "white officer" would be "excluded from consideration." Similarly, if he was "replacing a white captain," then "an African-American lieutenant was excluded from consideration." In that way, Turner "reserved a number of captain positions in Zones 1 through 6, the field zones, for white officers." And others for Black officers.

Turner testified that in December 2014, Zone 2 had an African-American Captain in office, and so "he or she was going to be replaced by a well-qualified African-American officer." Turner's practice "excluded from consideration people of every other race" but African-Americans for that position. Turner never considered Joyner, who was White, for the position of Captain in Zone 2.

But Turner also testified at trial that he did not exclude any candidates from appointment to Captain based on their race. He repeatedly pushed back on Joyner's counsel's use of the word "reserved" to describe how race influenced his selections. He clarified: "You keep using the word 'reserved.' I had the sole discretion to change the major to a white or a black commander, which I did on multiple occasions." And he stated: "I will not say I reserved a position for any race or gender."

Instead, Turner testified, his "intent was to make sure that we had the best individual for each rank at every appointment." In his own words, he explained that he had maintained "a long-standing practice that we were represented at all ranks and races through our department." He tried to "keep a balance" of three Black and three White Captains, though at least at one point there were four White and two Black Captains.

Turner was adamant that he had replaced outgoing officers with new appointees of different races on "[m]ultiple occasions." For example, in the December 2014 personnel order that Joyner challenges, Turner replaced Major Finley, who is Black, with a White person. And he testified that when Assistant Chief Andresen, who is White, retired, Turner promoted a Black commander to that position.

Other testimony also shows that Turner did not always replace outgoing officers with people of the same race. Joyner himself testified that he had seen Chief Turner replace a Black Captain or Major with a White Captain or Major. And Joyner's own witness, Lieutenant Azie Horne, admitted that in Zone 6, he had observed that Chief Turner replaced a White Major with a Black Major.

Turner added that he had a practice of moving new Captain appointees out of the Zones in which they had previously been working so that they would not be supervising their former peers. Joyner, who was in Zone 2 at the time of the personnel order he is challenging in this case, was aware of that practice.

5. On or Around October 15, 2015, Joyner Reported
   Allegations of "Ticket Fixing" to OPS and the FBI.

In August of 2015, Officer Tom Coxe pulled over the grandson of Andrew Young (the former Mayor of Atlanta and former Ambassador to the United Nations). Coxe issued him three traffic citations. According to Chief Turner's testimony, the grandson then called Turner (with whom he had a personal relationship) and reported that Coxe had given him unclear instructions during the traffic stop. Turner asked Major Hobbs to check on the incident. Hobbs and Coxe discussed the matter, and Coxe decided to void the tickets.

Then Joyner got involved. He testified that Coxe told him that Coxe had "been asked to change some tickets" to warnings, and to do it for Hobbs and Turner. Joyner understood that, during Coxe's conversation with Major Hobbs, Coxe felt like he was being "threatened" with the risk of losing his "off days" or "being transferred" if he did not downgrade the tickets. (Turner and Hobbs insist that they never asked Coxe to void the tickets and their only purpose in questioning Coxe about the traffic stop was to find out what had happened.)

On or around October 20, 2015, Joyner reported Hobbs and Turner to the FBI and OPS for "fixing" the tickets. He alleged that Hobbs improperly instructed Coxe to "take the tickets back."

Turner and Hobbs were aware Joyner had filed the OPS report against them. Hobbs was "frustrated" that Joyner had done

that.  Zone 2 Captain Sharonne Steed recalled Hobbs "being upset about the complaint."

> 6. On October 27, 2015, Hobbs took
>    away Joyner's "flextime."

Before October 2015, Joyner had been able on occasion to start work early and at other times to work late, thereby "chang[ing] [his] schedule to accommodate what [he] need[ed] to do."  But Joyner was stopped from doing that just one week after he had filed the ticket-fixing report.  On October 27, 2015, at the direction of Hobbs, Captain Steed notified Joyner that from then on he would be required to work a shift from 10:00 a.m. to 6:00 p.m.  In that way he was put on a "fixed" schedule and taken off a "flexible" schedule or "flextime" as it is sometimes called.

Joyner emailed Steed on that same day to ask when his new schedule would begin, explaining that: "I need to re-arrange an extra Job and the schedule with my kids."  Steed responded that the schedule change was "effective immediately."

Joyner testified that when Steed told him about the schedule change, she also said: "I don't know what's going on with you and the City, and I don't want to have anything to do with it.  This is coming down from above me . . . ."

Joyner testified that the ability of officers ranked Lieutenant (as he was) or higher to work a flexible schedule was a "custom that goes on" and had "been going on" in the APD for years.  Other testimony supported that fact.  Steed agreed that there was an "informal" flextime policy, and that officers ranking Lieutenant or

higher could use it to "[b]alanc[e] the hours out" and work extra jobs if they wanted to. She herself used flextime to "cut out early" and pick up her daughter or accompany her elderly parents to appointments. Major Daniel Rasmussen similarly testified that Lieutenants were sometimes "allow[ed] . . . to alter their hours" and "come in later" in order to work other jobs. He said that holding an extra job is a "privilege" at the APD.

Joyner himself had been using his flexible schedule to supplement his income by working an additional job in the afternoon as an off-duty patrol officer for a private security company. By the time of the schedule change, Joyner had held that second job for at least twelve years. He testified that the elimination of his flextime cut his income by causing his second job wages to be reduced by at least two-thirds.

Joyner also testified that his superiors "knew that [he] had to be at [his second job] at a certain time in the afternoon," and he had "a permit" (a written document signed by his "commanders") allowing him to work that position. That's consistent with the department's Standard Operating Procedures, which require that an employee obtain written permission from the Chief or the Chief's designee before the employee can "engage in any employment outside the Department."

Joyner testified that his loss of flextime also disrupted his ability to pick up his young children (ages 5 and 9 at the time) from school. Picking them up then was both a personal commitment and, under a divorce decree, a legal obligation. After his flextime

schedule was taken away, Joyner told his supervisors he had to have more flexibility to take care of his kids, and he received permission to end his workday at 4:00 p.m. twice a week to pick up his children from school.

But even with that partial dispensation, Joyner was still unable to fulfill his legal obligation to pick up his children after school three times a week every *other* week. More specifically, he was left unable to fulfill the terms of his divorce decree once every two weeks. And if some "important" issue "came up" with his children, Joyner lacked the flexibility to deal with it. He testified that if "something came up where [he] needed to go get them," he would now have to "call [his] supervisor and take of[f] from work and clock out and go do it."

On November 3, 2015, Joyner emailed Captain Steed about his loss of flextime to "put on the record that this is an unwanted shift change" and to state that he "firmly believe[d] [it was] retaliatory and directly related to [his] complaint(s) and not the needs of the department." Steed responded in part: "The change to you having more set hours are [sic] not in any way related to legal action you have ongoing with the City of Atlanta. . . . The set hours are for more awareness when you will be at work and physically available to your unit personnel and citizens, as with all lieutenants under Zone 2 command."

Major Hobbs and Chief Turner deny that the schedule change was retaliatory. Hobbs testified that it "had nothing to do

with the OPS investigation" of him and that he gave the OPS investigation "no consideration whatsoever" when he put Joyner on a fixed schedule. Instead, he asserts that he changed Joyner's hours in response to issues with Joyner's accessibility. Hobbs testified that Joyner was not returning missed calls. Hobbs added that on one occasion after he had been unable to reach Joyner, he sent him an email saying, "this is the third time you've been unavailable by your cell phone." (That email is not in the record.)

Hobbs admitted that "a month or two" passed between that email and the change in Joyner's schedule. He suggested that some unspecified event finally pushed him to take away Joyner's flextime, explaining: "I gave him another opportunity and after that last opportunity that's when I told Captain Steed since I can't find him, tell him he is on a fixed schedule, Monday through Friday, 10 a.m. to 6 p.m." Hobbs did not provide any detail about the one "last opportunity" he gave Joyner and how Joyner failed to take advantage of it.

In his testimony Joyner admitted that Major Hobbs had told him he was "having difficulty contacting" him. But in Joyner's telling, the communication issue was not entirely his fault. Joyner remembered two occasions before October 27, 2015 (the day his flextime was removed) when Hobbs had struggled to contact him. On one of those occasions Joyner was at home, and he had made it "very clear" to Hobbs that it was difficult to reach him at home due to cell service issues in the area. On the second occasion Joyner recalled Hobbs having trouble reaching him, Joyner had been on

duty at Lenox Mall, where it is difficult to get a cell phone signal or even "get a police radio to work."

Joyner, against his wishes, worked the fixed schedule for a period of eight or nine months, until he was transferred to Zone 5, outside of Hobbs's chain of command. Once in Zone 5, Joyner was again allowed to work a flexible schedule. So the claimed retaliatory harm allegedly resulting from his reporting ticket fixing was the loss of his ability to work a flextime schedule for a period of eight or nine months.

### B. The Pretrial Proceedings

Joyner filed a lawsuit asserting four claims that are relevant to this appeal. One was a Title VII racial discrimination claim, *see* 42 U.S.C. § 2000e-2(m), against the City of Atlanta, Chief Turner, and Major Finley, based on the theory that Joyner was denied a Captain position in 2014 because Turner had a policy of replacing outgoing Black and White captains with captains of the same race. The district court granted the motion to dismiss that claim against Finley and Turner because Title VII grants relief only against employers, not against employees. That dismissal is not challenged on appeal. The court did not dismiss the Title VII claim against the City itself; that claim proceeded to trial.

The other three claims in the lawsuit were based on allegations of retaliation: (1) a claim under Title VII, *see* 42 U.S.C. § 2000e-3, against the City alleging that it denied Joyner a Captain position in 2014–15 because of his 2008 complaint of racial discrimination; (2) a First Amendment claim under 42 U.S.C. § 1983 against

Turner and Hobbs alleging that they took away his ability to work flextime because he reported ticket fixing to the FBI and the Office of Professional Standards; and (3) a Georgia Whistleblower Act, *see* Ga. Code Ann. § 45-1-4, claim against the City alleging that the same loss of a flextime schedule was retaliation based on Joyner's report of ticket fixing.

The City, Turner, and Hobbs moved for summary judgment. A magistrate judge issued a report recommending that the court deny the motion for summary judgment on Joyner's Title VII racial discrimination claim, but that it grant the motion on Joyner's three retaliation claims. The district court determined that Joyner's objections to the magistrate judge's report and recommendation had "no merit." It concluded that Joyner's Title VII retaliation claim failed because there was no causal connection between his 2008 complaint of racial discrimination and the decision not to appoint him Captain in 2014–15. The court also concluded that Joyner's § 1983 First Amendment and Georgia Whistleblower claims failed because he had not shown an "adverse employment action." The district court approved the report and recommendation and adopted it as the judgment of the court.

### C. The Trial and Post-Trial Proceedings Involving the Title VII Discrimination Claim

Joyner's Title VII racial discrimination claim — and that claim alone — proceeded to trial. On the second-to-last day of the four-day trial (not including jury deliberations), after Joyner had presented his case and before he rested, he moved under Federal

Rule of Civil Procedure 15(b)(2) to amend the pleadings to conform to the evidence. He sought to add an equal protection claim under 42 U.S.C. § 1983 and a 42 U.S.C. § 1981 claim.[2] The court allowed Joyner to add the equal protection claim, but not the § 1981 claim.

Right after he moved to amend the pleadings, Joyner moved for judgment as a matter of law under Rule 50(a). Pointing to Chief Turner's testimony that he "reserved" certain positions for people of certain races, Joyner moved the court to direct a verdict for him on the Title VII claim. The court denied that motion.

The first two questions on the verdict form asked the jury to enter findings by a preponderance of the evidence on two questions. One: did the City "den[y]" Terry Joyner an appointment to Captain? Two: if so, was race a "motivating factor" in that decision?

Joyner objected to the first question on the verdict form, the one asking whether the City had "denied" him a promotion. He argued that was not an independent element of his Title VII claim

---

[2] Title 42 U.S.C. § 1981(a) states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." The statute's prohibitions include "racial discrimination against white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976).

because it did "not reference in any way . . . that race was a factor in the denial of the appointment."  The court overruled the objection.

Before the jury got the case, the parties had stipulated that the APD's "promotion process" is set forth in the City's Code of Ordinances (stipulated fact #4).  And they had stipulated that according to that Code, "Chief Turner was the sole decision-maker for appointments to the positions of Captain or higher" (stipulated fact #5).  During deliberations, the jury asked to "see the City of Atlanta Charter that grants authority to [the] Police Chief for appointments," citing stipulated fact #4.  (No one disputes that by "Charter," the jury meant the Code.)  The court provided the jury with the part of the Code which explained that certain appointments, including Captain appointments, are made at the discretion of the Police Chief.

Joyner also requested that the court provide the jury with the part of the Code that included the City's anti-discrimination employment policy.  He based that request on the Rule of Completeness and asserted that statements made by the City's attorney during closing arguments had confused the jury about whether Chief Turner was subject to those laws.  This is the part of the argument to the jury by the City's attorney that Joyner was talking about:

> You know, if [Turner] has that practice [of replacing outgoing Black Captains with officers of the same race], he ain't alone. . . . And it happens at the highest

levels of government you have to do this.  That is why
George H.W. Bush nominated Thurgood Marshall to
replace Clarence Thomas on the Supreme Court.
First black Supreme Court Justice replaced by a black
Supreme Court Justice.

(Of course, the City's attorney got it backwards.  Justice Thomas
was appointed to the seat vacated by Justice Marshall, not the other
way around.) The court denied Joyner's request to provide the jury
with the part of the Code containing the anti-discrimination policy.

The jury returned a verdict in favor of the City on Joyner's
Title VII discrimination claim.  The jury answered "no" to the question of whether the City had denied Joyner an appointment to Captain (the question to which Joyner had objected). As we'll discuss,
the City's explanation for the jury's finding is that Chief Turner
never had a reason to consider Joyner for that position, because
Joyner had failed to put himself forward as a candidate and also because of his unsatisfactory performance in other roles. The jury did
not reach the other question on the verdict form.

Following trial, Joyner filed a motion for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59.  His
motion challenged the court's decisions (1) not to direct a verdict
as to liability on the Title VII claim, (2) to overrule Joyner's objection to the first question on the jury verdict form, and (3) not to
send the jury the part of the Code containing the City's anti-discrimination policy in response to its question about Chief Turner's

appointment authority.  The district court denied the motion.  This is Joyner's appeal.

Joyner challenges the grants of summary judgment to Chief Turner, Major Hobbs, and the City on his retaliation claims.  He also challenges rulings the district court made involving the trial of his claim that racial discrimination was a motivating factor behind the City's failure to promote him to captain in 2014–15.

## II. DISCUSSION

We will start by reviewing the district court's grant of summary judgment on Joyner's three retaliation claims and then review the trial and post-trial rulings on his discrimination claim, which survived summary judgment but not the jury trial.

### A.  The Grants of Summary Judgment Against Joyner on His Three Retaliation Claims

The three retaliation claims Joyner brought were: (1) a claim under Title VII that he had been retaliated against in 2014 for complaining in 2008 about racial discrimination against white employees; (2) a claim under 42 U.S.C. § 1983 that he had been retaliated against for reporting ticket fixing; and (3) a Georgia Whistleblower claim that he had been retaliated against for reporting ticket fixing.

### 1.  The Grant of Summary Judgment on the Title VII Retaliation Claim

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [that employee] has opposed any practice made an unlawful employment practice."  42

U.S.C. § 2000e-3(a).  The word "because" is key.  Unless the plaintiff establishes that element, a Title VII retaliation claim cannot survive.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("[A] plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) ("[A] plaintiff must prove that had she not engaged in the protected conduct, she would not have [suffered the adverse action].") (alteration adopted) (quotation marks omitted).

Joyner's claim alleged that in December 2014 he was denied a promotion to Captain because nearly seven years earlier, in February 2008, he had complained about racial discrimination. The district court granted summary judgment against Joyner after determining that he had not created a genuine issue of fact about whether his 2008 complaint about racial discrimination was the reason the City did not promote him in 2014.  The court was right to do so.

To prevail on a Title VII retaliation claim, the causation element requires a plaintiff to show that the decisionmaker was aware of the protected conduct, which in this case is the complaint Joyner had made about racial discrimination six years earlier. *See McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took [the] adverse

action."); *see also Hudson v. S. Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988) (affirming grant of summary judgment to the defendant on retaliatory discharge claim where there was uncontradicted evidence the decisionmakers did not know of the plaintiff's protected conduct); *McCollum v. Bolger*, 794 F.2d 602, 610–11 (11th Cir. 1986) (affirming judgment for defendant and holding that the plaintiff failed to prove a prima facie case of retaliation where the evidence showed that the decisionmaker did not know that the plaintiff was engaging in protected conduct). There is an exception for "cat's paw" situations, *see Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008), but there is no evidence of a paw, whether a cat's or otherwise, in this case.

Chief Turner was the sole decisionmaker on the question of who would get the 2014 promotion. Major Finley was the person to whom Joyner had made the complaint about racial discrimination in 2008. Finley testified in his deposition that he never said anything to Chief Turner about Joyner's complaint. And Chief Turner testified in his deposition that Finley never told him that Joyner had made any complaints of racial discrimination. Their testimony was unrefuted. Joyner presented no evidence that anyone had ever informed Chief Turner of Joyner's 2008 complaint. None.

Joyner urges us not to credit Chief Turner's unrefuted, "self-serving testimony" that he didn't know Joyner had complained about discrimination. Joyner argues that we should instead infer Turner knew about Joyner's complaints because Finley knew

about them, and Joyner considers it "obvious[]" that Finley was attempting to suppress allegations of racial discrimination on Turner's behalf.  But Joyner's judgment about what is obvious is not evidence.

And we have held that the fact sworn statements are self-serving does not permit us to disregard them at the summary judgment stage. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."); *see also id.* at 1246 ("As Logan Bleckley, one of Georgia's greatest judges, explained more than a century ago: 'Interest and truth may go together.'").

Alternatively, in Joyner's view, Turner "could have found out about Joyner's complaint [alleging there was racial discrimination] from OPS, Lt. Lyle, or a number of other sources."  But what *could* have happened is not evidence that creates a genuine issue of fact about what did happen; it's speculation, conjecture, and wishful thinking that doesn't stand a chance against unrefuted testimony going the other way. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment. . . . [S]ummary judgment was appropriate because there was no evidence that the decision-maker was aware of the plaintiff's [protected status].") (quotation marks omitted); *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (explaining that on summary judgment,

"[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable") (quotation marks omitted).

After the City presented evidence in the form of sworn testimony from Turner that he was not told Joyner had reported allegations of racial discrimination, the burden shifted to Joyner to "come forward with sufficient evidence to rebut this showing," which required "relevant and admissible evidence," not mere "conclusory allegations." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Because Joyner didn't do that he failed to meet his burden of presenting evidence to rebut the defendants' evidence, which entitled the defendants to summary judgment. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) (affirming the grant of summary judgment to an employer on a retaliation claim because "the evidence [was] unrefuted that . . . the decision maker[] did not know" the employee had engaged in protected activity, so the employee "failed to create a genuine issue of fact as to a causal connection between" the protected activity and the adverse action). That is enough to defeat a Title VII retaliation claim. *See McCann*, 526 F.3d at 1376; *Goldsmith*, 996 F.2d at 1163.

Sometimes a "close temporal proximity" between the protected conduct and the adverse action is enough to bolster a causal link between the two. *See McCann*, 526 F.3d at 1376 (quotation marks omitted) (concluding that an employee made out a prima facie case where five days passed between the employer's receipt

of the employee's grievance and the retaliation).  But the proximity here is not even close to close.  More than six years — over 2,500 days — passed between Joyner's complaint about racial discrimination in February 2008 and Chief Turner's decision not to promote him to Captain in December 2014.  Nothing in the record allows us to infer that those two distantly spaced events were in any way related.

Not giving up easily, Joyner argues that he suffered "a pattern of antagonism" following his protected conduct in 2008 that bridges the six-year delay between his protected conduct and the retaliation he alleges.  He points to: (1) Major Finley's angry response in 2008 when he was told about the accusations of racial discrimination; (2) Finley's act of changing Joyner's schedule to patrol night watch 14 days after Joyner instigated an OPS investigation into the complaints of racial discrimination in February–March of 2008;  (3) Lyle's statement to Joyner that Finley would "never forget" Joyner's complaint (February 2008); and (4) the City's failure to promote Joyner over the next several years.  The first three of those events involve Finley who was not the decisionmaker, instead of Chief Turner who was.  And all three of those events occurred in early 2008, so there's still a six-year gap.  The three events cannot support an inference that Joyner suffered discrimination six years later, when he was not promoted to Captain based on a choice made by someone other than Finley.

Nor does the fact that the City did not promote Joyner during that six-year period indicate a long simmering resentment over

his 2008 complaint.  Joyner has failed to identify any particular positions in specific zones to which he should have been promoted at any particular times during those six years or any position he requested to be considered for.  And his theory of simmering resentment against him is contradicted by the fact that Chief Turner gave him the opportunity to lead an elite unit — the fugitive squad — between 2012 and 2014.  Turner put Joyner in that position because Turner believed at that time Joyner was "on the right track" and he wanted to give Joyner an opportunity to prove himself.  He didn't prove himself, at least not in a positive way.  Joyner's argument does not deal with the fact that he had multiple performance issues during those six years, *see supra* at 4–6, which runs counter to any argument that he deserved to be promoted.

Joyner relies on two decisions from our Court where employees' retaliation claims survived summary judgment despite multi-month temporal gaps between protected conduct and retaliatory act.  Instead of helping him, those two decisions highlight why the necessary causal link is lacking in his own case.

In one of those cases, *Simmons v. Camden County Board of Education*, 757 F.2d 1187 (11th Cir. 1985), high school teachers sued their Board of Education, alleging that they were fired in retaliation for filing complaints of discrimination.  *Id*. at 1188.  Their discrimination complaints were filed the summer before their February terminations.  *Id*. at 1189.  We held that the plaintiffs had made out a prima facie Title VII retaliation case because of what the deci-

sionmaker had done during those eight months. He had made "remarks . . . demonstrating his displeasure" with the investigation that resulted from their complaints and he had commented that he "associate[d]" one of the plaintiffs with the investigation. *Id.* That was enough to present a genuine issue of fact about whether the plaintiffs' complaints were a cause of the adverse action.

Three factors distinguish the *Simmons* case from this one. First, eight months is not 82 months (February 2008 to December 2014). Second, not only did Chief Turner not make any remarks about the protected conduct during that time, the unrefuted evidence is that he did not even know about it. Third, unlike the decisionmaker in *Simmons*, during the period between protected conduct and alleged retaliation Turner gave Joyner the opportunity to prove himself. Because of those differences, *Simmons* is readily distinguishable from this case.

Joyner also points to our decision in *Stanley v. City of Dalton*, 219 F.3d 1280 (11th Cir. 2000). There we concluded that an officer's First Amendment retaliation claim survived summary judgment despite "an almost four year gap between his protected speech and his termination." *Id.* at 1291. But the plaintiff in *Stanley* presented evidence of ongoing unfair treatment during those four years, including being "confronted . . . about his [protected] statements," "transferred" against his will, and "reprimanded." *Id.* at 1292. Joyner has failed to show that he suffered any similar mistreatment during the six-year gap in his case. *See supra* at 4–6.

A six-year gap without any alleged mistreatment during that time is not a four-year gap with discriminatory treatment during the time. We noted in *Stanley* that the almost four-year gap in that case "arguably defeat[ed] causation," and thought it was "a close call" whether the plaintiff had presented enough evidence to create a genuine dispute on causation. 219 F.3d at 1291–92. By contrast, the six-year gap free of discriminatory acts in this case does not present a close call, or even a close call about whether there is a close call. There isn't. Because Joyner has failed to show a genuine issue of fact about whether there was a causal connection between his protected activity in 2008 and his not getting a promotion in 2014, we affirm the grant of summary judgment to the City. *See Crawford*, 529 F.3d at 970.

### 2. The Grant of Summary Judgment on the First Amendment Retaliation Claim

When an official asserts a qualified immunity defense, and it's established, as it is here, that he was acting within the scope of his discretionary authority, the plaintiff must make two showings. *See Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024). One is that the official "violated a statutory or constitutional right" and the other is "that the right was clearly established at the time of the challenged conduct." *Id.* (quotation marks omitted). We're free to address "the merits and clearly-established prongs in either order, and an official is entitled to qualified immunity if the plaintiff fails to establish either." *Id.* (quotation marks omitted); *see also Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019) ("We may

address the two parts in either order."); *see also Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024); *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019); *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). We will start with the merits.

### a.  The Claim on the Merits

Joyner's First Amendment retaliation claim, procedurally enabled by 42 U.S.C. § 1983, is against Major Hobbs and Chief Turner. It alleges that their decision to no longer allow Joyner to work a flexible schedule was made in retaliation for his reports to the FBI and OPS about ticket fixing.[3]

To establish a First Amendment retaliation claim, a plaintiff must "demonstrate that the asserted right is protected by the Constitution and that he . . . suffered an adverse employment action for exercising the right." *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300 (11th Cir. 2005) (quotation marks omitted). There is no dispute that Joyner's conduct in filing a report with the FBI and OPS alleging that Hobbs and Turner engaged in ticket fixing is protected by the First Amendment. Nor is there any dispute that a week after he filed that report the privilege of working flextime was taken away

---

[3] Neither Hobbs nor Turner has argued that we should treat them differently for purposes of assessing Joyner's First Amendment claim. Hobbs gave the order to put Joyner on a fixed schedule. Turner testified that he was aware that Hobbs was doing that. He did nothing to prevent it. Turner does not argue that he wasn't involved in the decision to remove Joyner from a flextime schedule. He and Hobbs travel together on this issue.

from him, requiring him to work a fixed-hours schedule.  The question is whether Joyner's loss of a flextime schedule was material for retaliation purposes.

Built into the adverse action element of an anti-retaliation claim is a requirement of injury or harm.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (holding that Title VII's anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm").  The Supreme Court has explained that, "We speak of *material* adversity because we believe it is important to separate significant from trivial harms." *Id*. at 68; *see also id*. at 69–70 ("By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.").[4]

That makes sense not only in Title VII retaliation cases but also in First Amendment retaliation cases like this one because the purpose of all prohibitions against retaliation is to prevent those

---

[4]One other point: to the extent that First Amendment retaliation claims have an "important condition of employment" requirement but Title VII claims don't, that does not matter here.  It doesn't matter because the loss of flextime, or viewed from a different direction, the imposition of a fixed schedule, can involve an important condition of employment. And here it does, as we explain in the text discussing the materiality of the change to an employee in Joyner's circumstances. *See infra* at 34–40.

who would engage in protected conduct or speech from being de-terred, dissuaded, or chilled from doing so by the fear of reprisals.

Their purpose is not to get the judiciary bogged down in ref-ereeing workplace squabbles involving "those petty slights or mi-nor annoyances that often take place at work and that all employees experience." *Burlington Northern,* 548 U.S. at 68; *See Akins*, 420 F.3d at 1302 (rejecting First Amendment claim to the extent it was based on an employer's action that did not "rise to that level of substan-tiality required by our caselaw"); *Stavropoulos v. Firestone*, 361 F.3d 610, 621 (11th Cir. 2004) (concluding that the asserted employer action was "not substantial enough to be actionable" under the First Amendment), *abrogated on other grounds by Burlington Northern*, 548 U.S. 53; *see also Kelly v. Omaha Hous. Auth.*, 721 F.3d 560, 562 (8th Cir. 2013) ("Reviewing whether an adverse employment ac-tion occurred [in support of a First Amendment retaliation claim], a court must distinguish petty slights or minor annoyances from a material change in the conditions or terms of employment.") (quo-tation marks and citations omitted); *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) ("[D]e *minimis* slights and insults do not amount to retaliation. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was al-ways actionable no matter how unlikely to deter a person of ordi-nary firmness from that exercise.") (quotation marks and citation omitted).

The First Amendment and Title VII standards for the ad-verse action element of a retaliation claim are not always phrased

identically.  *See Akins*, 420 F.3d at 1301 n.2; *see also Stavropoulos*, 361 F.3d at 619–20. A plaintiff asserting a Title VII retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks omitted).  And, as we will discuss, a public employee asserting a First Amendment retaliation claim must show that the employer's action involved an "important condition of employment" and "would likely chill the exercise of constitutionally protected speech." *Akins*, 420 F.3d at 1300 (quotation marks omitted).

Notwithstanding any semantic differences, we have observed that the Title VII and First Amendment standards for adverse actions are "consonant." *Id.* at 1301 n.2; *Stavropoulos*, 361 F.3d at 619.  Each standard "inform[s]" the other. *Akins*, 420 F.3d at 1301 n.2 ("[W]e regularly use First Amendment cases to inform our analysis of Title VII retaliation claims."); *Stavropoulos*, 361 F.3d at 619 ("[W]e regularly draw cases applying [the requirement that a plaintiff asserting a First Amendment retaliation claim establish an important condition of employment] to inform our analysis of Title VII retaliation claims.").  That is why we have cited Title VII retaliation decisions, including *Burlington Northern*, when analyzing First Amendment retaliation claims. *See, e.g., Akins*, 420 F.3d at 1301 n.2 (explaining why "we cite some Title VII cases to inform our [First Amendment] analysis"); *Booth v. Pasco Cnty.*, 757 F.3d

1198, 1212 (11th Cir. 2014) (citing *Burlington Northern* and recognizing the similar purpose of Title VII and First Amendment anti-retaliation principles).  And why we are doing it here.

Other circuits have done the same.  *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) ("Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*."); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 n.12 (4th Cir. 2018) ("The standard for proving a materially adverse action in the Title VII retaliation context . . . is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context.") (citing *Burlington Northern*, 548 U.S. at 68); *Couch v. Bd. of Trs. of the Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1237–38 (10th Cir. 2009) ("The test in *Burlington Northern* is also consonant with our First Amendment employment retaliation cases. . . .  Additionally, the test in *Burlington Northern* is analogous to the standard articulated by several other circuits in the First Amendment context.").

We have recognized that "as a matter of law, important conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands," as well as "any other conduct that alters the employee's compensation, terms, conditions, or *privileges* of employment." *Akins*, 420 F.3d at 1300 (emphasis added) (quotation marks omitted).  Any of that type can satisfy the adverse action element if they are material.  The most relevant here is "privileges of employment."

It is undisputed that for more than a decade, Joyner had used his flextime schedule to work a second job with a private security company, which supplemented his income. Not having a fixed schedule of hours had also enabled him to pick up his young children (ages 5 and 9) from school, which was both a personal commitment and a legal obligation under his divorce decree. The loss of flextime prevented him from picking them up on Fridays. And if "something came up where [he] needed to go get them" from school, without flextime he would have to "call [his] supervisor and take of[f] from work and clock out and go do it." Not only that but the loss of his flextime privilege meant Joyner could not work as many hours at his second job, which reduced his wages at that job by at least two-thirds.

We believe that, for Title VII purposes at least, it is bountifully clear that the type of loss Joyner suffered because his work schedule was changed from flextime to a fixed schedule of hours is material for materiality purposes. In discussing the difference between minor and material employment-related changes, the Court in *Burlington Northern* stated that the significance of any given act of retaliation will often depend upon the particular circumstances. 548 U.S. at 69. The Court gave this example: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id*.

By the same token, it matters a lot to a father with school-age young children for whom he not only felt a personal obligation

to pick them up from school but was also legally obligated to do so under the terms of a court decree. An "act that would be immaterial in some situations is material in others." *Id.* (quotation marks omitted). The loss of a privilege of employment like the one Joyner suffered is one that would deter, dissuade, or chill a reasonable employee in his circumstances from engaging in protected activity. *See Akins*, 420 F.3d at 1300; *Burlington Northern*, 548 U.S. at 67–70.

The facts construed in Joyner's favor persuaded the district court, as they persuade us, that Turner and Hobbs violated his constitutional rights. But the district court was persuaded that they were entitled to summary judgment on qualified immunity grounds. We are not.

### b.  The Qualified Immunity Defense

Although the facts viewed in Joyner's favor show that Turner and Hobbs violated his First Amendment rights, they would be entitled to qualified immunity if they were "performing discretionary functions" (which is not disputed) and if "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanley*, 219 F.3d at 1285 (quotation marks omitted). The district court concluded that their conduct didn't, which is why it ruled that Hobbs and Turner were entitled to qualified immunity-based summary judgment on the First Amendment claim.

We recognize three ways in which a plaintiff can demonstrate a violation of clearly established law: (1) "he can point us to

a materially similar case that has already been decided"; (2) "he can point us to a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (alterations adopted) (quotation marks). Under any approach, "we look for fair warning to officers that the conduct at issue violated a constitutional right." *Gaines*, 871 F.3d at 1208 (quotation marks omitted); *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable state official that his conduct was unlawful in the situation he confronted." *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013) (alteration adopted) (quotation marks omitted) (emphasis omitted).

The broad principle of law approach applies to the particular circumstances of this case. *See Echols*, 913 F.3d at 1324. At the time of the alleged misconduct, it was clearly established that government officials cannot lawfully strip an employee of "privileges of [his] employment" where those privileges are important enough to the employee that taking them away would chill his expression of protected speech. *See Akins*, 420 F.3d at 1300 (quotation marks omitted). With the facts viewed in the light most favorable to Joyner, that's exactly what Hobbs and Turner did by taking away from him the privilege of his flextime benefit.

Working a flexible schedule was a privilege that the APD extended to all officers who had reached the rank of Lieutenant. Joyner testified in his deposition it was an APD "custom" to give that privilege to Lieutenants. Captain Steed testified that "flextime" was an "informal way" to allow Lieutenants and higher-ranked officers to "[b]alanc[e] the hours out" and work extra jobs. One APD major explained in his deposition that Lieutenants could "alter their hours" to work other jobs, and he said that holding an extra job is a "privilege."

Joyner's use of his flextime benefit while he had it shows its importance to police officers like him. For over twelve years he had used flextime to work a second job for a private security company. His supervisors knew that Joyner worked that second job on a regular schedule. They knew it was a source of additional income for him. The loss of that privilege diminished the hours Joyner could work at his second job and thereby reduced his income. It reduced his total income just as a reduction in his pay at the police department by the same amount would have. And Joyner also used flextime to pick up his young children from school, which was his legal obligation under a divorce decree.

Any reasonable supervisor would know that flextime was a "privilege[] of employment" important enough to Joyner that if he engaged in protected speech, as he did, taking that privilege away would chill his, and any reasonable officer's, expression of speech in the future. *See Akins*, 420 F.3d at 1300 (quotation marks omitted).

Our precedent on transfers reinforces that conclusion. Stripping away a privilege held by a class of higher-ranked employees is similar to transferring an individual to a less desirable position. And this Court has long held that a transfer to a less desirable position can constitute an adverse action supporting a First Amendment claim. *See, e.g.*, *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1316–18, 1321 (11th Cir. 2005) (affirming the denial of summary judgment to a school district on a bus driver's First Amendment retaliation claim where she was "transferred" to a new group of drivers, meaning she lost her "team leader" position and the "prestige and office responsibilities" that came with it); *McCabe v. Sharrett*, 12 F.3d 1558, 1559, 1564 (11th Cir. 1994) (concluding that a plaintiff employee established an adverse action on summary judgment based on the employer police chief "transferring her from her job as secretary to the police chief to a less desirable job"); *Waters v. Chaffin*, 684 F.2d 833, 835 & n.5, 837 n.9, 840 (11th Cir. 1982) (concluding an officer who was placed "in another department within [the same county] at an appropriately lower graded classification" with a salary "as nearly comparable as possible" had established a First Amendment violation; also listing authorities for the proposition that a "transfer" can support a First Amendment claim); *Patton v. King*, 544 F.2d 827, 829–30 (5th Cir. 1977) (reversing the grant of summary judgment to an employer where there was a genuine dispute of material fact as to whether the employee teacher's "reassignment" from teaching one group of students to another group required "different skills . . . to teach each category"

and whether the transition could be made "easily").[5] All of those cited decisions existed before the defendants took away Joyner's flextime benefit.

Although Joyner's supervisors did not reduce the salary he received from the APD, they did reduce the total amount of the salaries he received from the APD and his outside employer and in that way reduced his total income.  Money is fungible and total income is what pays the bills. To argue that total income from total employment does not count when measuring adverse action is to argue against the basic economics of working life.

The decision to strip Joyner of the privilege of working flextime effectively reduced his total income because it resulted in a reduction of hours, and hence a reduction of income, from his second job.  We have long held that "if an employer's conduct negatively affects an employee's salary" and "would likely chill the exercise of constitutionally protected speech," it is an adverse action for purposes of a First Amendment retaliation claim.  And that is true whether the negative effect is directly or indirectly caused by the employer's conduct.  *See Akins*, 420 F.3d at 1300; *see also Cook*, 414 F.3d at 1318 (concluding plaintiff's loss of a position "which had guaranteed her forty hours of work per week" was an adverse action where she lost that guaranteed number of hours and with it

---

[5] Decisions by the former Fifth Circuit handed down before October 1, 1981, are binding on this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

40                    Opinion of the Court                    22-13728

the guarantee she could earn the same amount of money); *Walker v. Schwalbe*, 112 F.3d 1127, 1130–31 (11th Cir. 1997) (holding that a salary reduction along with a demotion was an adverse action); *McCabe*, 12 F.3d at 1564 (concluding that a transfer to another position was an adverse action where the plaintiff lost some "eligibility for salary increases" although "her salary ha[d] not decreased"). Even though Joyner's employer did not directly reduce his APD salary, the loss of flextime was an action that would likely chill his speech because it had the materially adverse effect of reducing the total of his salaries. *See Crawford*, 529 F.3d at 973 ("Under the holding of *Burlington*, the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related."). A reduction in total income is a reduction in total income, and that is clearly adverse.

When they revoked his flextime benefit, Joyner's supervisors knew he worked a second job, which was an additional source of income for him, and that without the flextime benefit at the APD, the hours he worked at that second job and the added income that came with it would be reduced. Given these circumstances, *Burlington Northern*, 548 U.S. at 68, and our precedent, every reasonable official standing in the shoes of Turner and Hobbs would know that taking away Joyner's flextime privilege would "alter[] . . . privileges of [his] employment" and "would likely chill the exercise of

[his] constitutionally protected speech." *Akins*, 420 F.3d at 1300 (quotation marks omitted).

In another argument, Hobbs and Turner contend they are entitled to qualified immunity because they removed Joyner's flextime — at least in part — for lawful reasons. *See Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996) (holding that a "defendant is entitled to [qualified] immunity" under a clearly-established law analysis "[w]here the facts assumed for summary judgment purposes . . . show mixed motives (lawful *and* unlawful motivations)"); *Stanley*, 219 F.3d at 1296 ("A defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, *at least in part,* by lawful considerations."). And, they say the evidence shows they would have made the same decision even absent Joyner's protected speech. *See Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1086 (11th Cir. 1996) (concluding there was insufficient evidence to support a jury verdict in favor of a plaintiff on a First Amendment claim where the defendant officials "presented overwhelming evidence" that they would have taken the same action "even in the absence of [the plaintiff's] speech").

But the evidence construed in the light most favorable to Joyner, as it must be at the summary judgment stage, would allow a jury to find that Hobbs and Turner took away Joyner's flextime privilege entirely for an unlawful, retaliatory purpose. *See supra* at

34–37. They can, of course, attempt to establish at trial that those are not the actual facts.[6]

### 3. The Georgia Whistleblower Act Retaliation Claim

Joyner's Georgia Whistleblower Act claim relies on the same theory as his First Amendment claim: that the removal of his flextime benefits was retaliation for his filing a report with the OPS and FBI. The Whistleblower Act claim is against the City, not Turner and Hobbs. And it has different elements from the First Amendment claim.

To get past summary judgment with a Georgia Whistleblower claim a plaintiff must create a genuine issue of material fact that he reported or disclosed "a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency." Ga. Code Ann. § 45-1-4(d)(2). The statute defines "law, rule, or regulation" as "any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." *Id.* § 45-1-4(a)(2).

---

[6] Turner and Hobbs may still assert a qualified immunity case at trial, in which case the district court should "use special verdicts or written interrogatories to the jury to resolve disputed facts [relevant to] . . . the qualified-immunity question." *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996) (quotation marks omitted); *see also Butler v. Smith*, 85 F.4th 1102, 1118 n.6 (11th Cir. 2023) ("Of course, [the defendant] can raise qualified immunity at trial, urge the jury to view the record as she has framed it, seek special interrogatories to resolve the historical facts underlying her immunity argument, and then resubmit the issue to the district court for decision.").

If the alleged misconduct reported by the employee is not a violation of or noncompliance with "a law, rule, or regulation" as defined in the statute, the employee's claim fails. For example, in *Edmonds v. Bd. of Regents of the Univ. Sys. of Ga.*, 689 S.E.2d 352 (Ga. Ct. App. 2009), the Georgia Court of Appeals concluded that university-associated employers were entitled to judgment as a matter of law on an employee's claim under the Whistleblower Act that the university's laboratory failed to "adhere to accepted 'biosafety rules.'" *Id.* at 357, *disapproved of on other grounds by Wolfe v. Bds. of Regents of the Univ. Sys. of Ga.*, 794 S.E.2d 85, 92 n.5 (Ga. 2016). That was not enough to state a claim because an accepted biosafety rule is not "a law, rule, or regulation" under the Act. *See id.*

The City argues that Joyner's complaint to the Office of Professional Standards about alleged ticket fixing did not involve the violation of a "law, rule, or regulation." Joyner stresses that his "complaint was about [Major] Hobbs unlawfully *threatening* [Officer] Coxe if he did not change the tickets or 'take them back.'" But Joyner's briefs to the district court and this Court do not specify which law, rule, or regulation doing that allegedly violated. Nor does his complaint. Nor does his amended complaint. The police department's memorandum summarizing Joyner's OPS complaint does not indicate that Joyner alleged the violation of any specific rule, regulation, or law, nor does it indicate that he explicitly accused anyone of doing anything "illegal" or "unlawful."

During his deposition, Joyner discussed his call to the FBI, but he never identified any relevant rule, regulation, or law that was

allegedly violated.  He acknowledged there is nothing "improper or illegal" about changing a traffic citation to a warning, which is within the discretion of the officer who wrote the citation.  And he admitted that it wasn't "improper" for a superior to ask an officer to change a traffic citation to a warning.

As in *Edmonds*, Joyner's failure to specify the law, rule, or regulation that was allegedly violated is fatal to his claim. 689 S.E.2d at 357.  We affirm the grant of summary judgment to the City on Joyner's Whistleblower Act claim.

### B.  Joyner's Challenge to Rulings Made in Connection With the Trial of the Title VII Discrimination Claim

As we've stated, the only claim that went to trial was Joyner's Title VII racial discrimination claim.  He lost a jury verdict on it, and the court entered judgment against him.  Attempting to have that part of the judgment reversed, Joyner raises four issues: (1) whether the district court abused its discretion in denying in part his motion to amend the complaint; (2) whether the court abused its discretion in its response to a request from the jury; (3) whether the jury verdict form accurately reflected the elements of the claim; and (4) whether Joyner is entitled to judgment as a matter of law in his favor on the claim.

### 1.  Denial in Part of the Motion to Amend the Complaint

At trial, after presenting his evidence, Joyner moved under Rule 15 to amend his complaint to add two claims: an equal protection claim and a 42 U.S.C. § 1981 claim.  The court allowed Joyner to add the equal protection claim, but not the § 1981 claim.

Joyner considers it "mysterious[]" that the district court allowed him to add the first claim but not the second. He argues that "the direct and circumstantial evidence which supported adding an equal protection claim, without question supported adding said Section 1981 claim." In particular, he emphasizes Chief Turner's testimony, which he views as "direct evidence" of racial discrimination.

Under Rule 15, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). And "[a] party may move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." *Id.* "[I]mplied consent under Rule 15(b) will not be found if the defendant will be prejudiced; that is, if the defendant had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend." *Cioffe v. Morris*, 676 F.2d 539, 541–42 (11th Cir. 1982).

When the trial started, the only claim to be tried was Joyner's claim for racial discrimination under Title VII. Discrimination claims under Title VII and 42 U.S.C. § 1981 "have the same requirements of proof and use the same analytical framework." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012) (quotation marks omitted); *see also Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (en banc) (applying the "same analysis" to Title VII and § 1981 discrimination claims).

But "[a] § 1981 claim differs in two relevant ways from a Title VII claim — there is no cap on damages and the causation standards are higher." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337–41 (2020) (explaining that a Title VII plaintiff can prevail by "show[ing] that discrimination was even a motivating factor," while a § 1981 plaintiff must show "but for" causation).

The City insists it "did not expressly or impliedly agree to try a Section 1981 claim" and would be prejudiced by the mid-trial addition of that claim. Noting that § 1981 has no damages cap, the City asserts it would have been "more aggressive" on the issue of damages if it had known that § 1981 was at issue. And the City points out that by the time Joyner made his Rule 15 motion, Horne, Joyner, and Turner had already testified.

We agree with the City that it would have been prejudiced by the mid-trial addition of a claim with a new causation standard and no damages cap after key witnesses had already testified. For that reason, the district court did not abuse its discretion in denying Joyner's Rule 15 motion. *See Cioffe*, 676 F.2d at 541–42.

Not only that, but Joyner also loses on the Rule 15 issue for another reason: the verdict against him on the Title VII discrimination claim dooms his § 1981 claim. The jury specifically found that the City had not denied Joyner a promotion to Captain in 2014, as his complaint had alleged. *See supra* at 19. We are affirming that verdict. Given that Joyner was not denied the promotion, he cannot

22-13728                 Opinion of the Court                    47

have been denied it on racial discrimination grounds. Especially not since the causation standard for a § 1981 claim is more difficult for a plaintiff to meet than the causation standard for a Title VII claim. *See Comcast*, 589 U.S. at 337–41; *Tynes*, 88 F.4th at 943. Joyner has not shown (and has barely made any effort to show) that the district court abused its discretion in denying his motion to amend his pleadings.[7] It didn't.

### 2. Response to the Jury's Request

During closing argument, Halima Horton White, who was counsel representing the City of Atlanta, compared Chief Turner's power to appoint Captains to the president's power to nominate Supreme Court justices. She said, "Let's talk a little bit about this practice," referring to Turner's admitted practice of taking race into account when he appointed Captains. "You know, if he has that practice, he ain't alone." She went on to tell the jury: "[W]hen

---

[7] Joyner's briefs to this Court do not address any of the City's arguments about why his motion to amend the pleadings was properly denied. He merely asserts that the evidence for his Title VII claim "supports" a § 1981 claim. He does not discuss the City's point that it would have been prejudiced by the belated addition of a new claim. And he does not discuss how the verdict on his Title VII discrimination claim affects his § 1981 claim. We could hold that Joyner has abandoned these issues. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("[A]n appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). But since there are two other good reasons to affirm the district court's denial of his motion to amend the pleadings, we will leave it at that.

48                    Opinion of the Court                    22-13728

they don't have diverse leadership in these government organizations, public confidence is not going to be there. . . .  That is why George H.W. Bush nominated Thurgood Marshall to replace Clarence Thomas on the Supreme Court. First black Supreme Court Justice replaced by a black Supreme Court Justice."  (Counsel's statement, probably inadvertently, flipped what she meant to say about who was nominated to replace whom, but the point of it was nonetheless clear.)

In this appeal the City, whose lead counsel is Ms. White, insists that her remarks were "not likening Chief Turner's appointment authority to the President's appointment authority."  But that is exactly what her "he ain't alone" remarks did. Otherwise, what was the point of the statement?  The strong implication of her statement was that, if Turner did make appointments based on race, he did only what others have done, and that implication was offered in the hope that the jury could be persuaded that it was somehow excusable for Turner to base employment decisions on race — just like it would be for a president to consider race in choosing who to nominate to fill a Supreme Court vacancy.

Of course, as counsel well knew, the Constitution expressly vests in the president the power to "nominate, and by and with the Advice and Consent of the Senate, . . . appoint . . . Judges of the supreme Court." U.S. Const. art. II, § 2, cl. 2. Chief Turner is not president. His authority to promote lieutenants to captains in the Atlanta Police Department comes from the City Code, not from the United States Constitution.  Counsel was well aware that in

making promotion decisions Chief Turner is subject to Title VII's prohibition against discriminating on the basis of race. And under Title VII, the City can be called to account in damages for any decision of his to discriminate in promotions based on race. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016).

Continuing her representation of the City, counsel told us that the point of her argument to the jury was that punitive damages were improper because Chief Turner, if he did consider race when making appointments, was "not a bad person" doing something "horrible." The record does not support that interpretation of her argument. In her closing argument, she did not link her improper remarks to punitive damages or damages in general, or even mention damages — not that her remarks would have been proper if she had done so.

It was improper for the City of Atlanta, through its lead counsel at trial, to represent to its citizens in a Title VII action that a Police Chief who made appointments based on race was simply following in the footsteps of others. There isn't a "he ain't alone" or "everybody does it" defense to a Title VII discrimination claim, nor is such an assertion relevant to damages.

But while Joyner's counsel objected to other parts of the defense's closing argument, he didn't object to these improper remarks. He didn't raise the issue as part of a request for a mistrial, or a new trial, or as a separate basis for reversal in this appeal. The

impropriety of the remarks comes to us only because they are related to another issue he has raised, an issue about the court's response to the jury's request to see a document.

During deliberations, the jury asked to "see the City of Atlanta Charter that grants authority to [the] Police Chief for appointments." The jury's request specifically referred to item number four from the stipulated facts that had been read to them during the trial. Stipulated facts number four and number five, which had been read to the jury during presentation of the defense case, state:

> 4. From 2010 through 2016, APD's promotion process is set forth in the Police, Fire, and Corrections Promotional Rules and Regulations, which are codified in the City's Code of Ordinance ("Atlanta City Code").

> 5. From 2010 through the time he retired as Chief, and per the Atlanta City Code, Chief Turner was the sole decision-maker for appointments to the positions of Captain or higher and himself appointed every individual that made the rank of Captain or higher.

In response to the jury's request, the court did not provide it with the entire City Code. Instead, it provided the jury with the subdivision titled "Police, Fire and Corrections Promotions." The "Definitions" part (Section 114-227) of that subdivision states: "*Discretionary ranks* means ranks . . . to which appointments can be made at the discretion of the police chief . . . ." And Section 144-230 states that the "rank of police captain" is "a discretionary rank."

Joyner's counsel asked the court to send the jury another part of the Code: Section 114-166, which sets forth the City's written "Equal Opportunity and Nondiscrimination" employment policy. He was concerned about opposing counsel's reference during closing argument to the president's appointment power, and he argued that "those decisions of the President to nominate a member of the Supreme Court are not subject to Title VII and . . . equal opportunity laws," while "Chief Turner is." He "speculat[ed]" that the jury's question indicated it was confused by defense counsel's reference to the president's appointment power. To cure that confusion, counsel for Joyner requested that the jury also be sent the part of the Code that "makes it clear that the appointment authority of Chief Turner is in fact subject to Title VII and equal opportunity laws." The court denied his request. It noted that the part of the Code about discretionary ranks was "in evidence already," while the anti-discrimination policy that Joyner wanted to send the jury would have been "new evidence" that the court didn't want to introduce at the deliberation stage.

In his post-trial motions under Rules 50 and 59, Joyner challenged the court's decision not to provide more of the Code to the jury, and the district court rejected that challenge.

Joyner contends that the district court abused its discretion by not providing the jury with the part of the Code containing the City's written anti-discrimination employment policy. His counsel colorfully argues that providing the jury with that material would be "a cure for the evidentiary harpoon" defense counsel launched

by "liken[ing] Turner's appointment authority to that of the U.S President's authority."

Joyner points to *Broaddus v. Florida Power Corp.*, 145 F.3d 1283 (11th Cir. 1998). In that case we ordered a new trial on a claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, after the district court failed to adequately respond to a jury question. *See* 145 F.3d at 1285, 1288. The jury heard evidence during trial that the plaintiff "had made substantial claims on the company's medical policies." *Id.* at 1287. That evidence was relevant to one of the plaintiff's other claims, but not to his ADEA claim. *See id.* After the other claim was dismissed, the jury asked the court about the "significance" of that evidence. *Id.* We held in *Broaddus* that the question revealed that the jury was "confused," and it "should have alerted the court that the jury was focusing on a non-issue and possibly did not understand the precise burden of proof under the ADEA for proving age discrimination." *Id.* But instead of alleviating that confusion, the district court's response had been to "inform[] the jury that it could give the evidence in question whatever weight it deemed appropriate." *Id.* at 1287–88. That was grounds for a new trial, we concluded, because we were "left with a substantial doubt as to whether the jury was properly guided in its deliberations." *Id.* at 1288.

The cases are distinguishable. Unlike in *Broaddus*, in this case there was nothing in the jury's request to see a specific document that indicated it was confused about how to weigh any evidence.

As the district court explained, instead of signaling prejudicial confusion, it "seem[ed] more likely that the jury, diligently surveying the evidence, wished to review for itself an item referenced by the parties but not otherwise introduced."

Joyner insists that, given opposing counsel's improper remarks, the jury may have thought Chief Turner was not subject to anti-discrimination laws. But the court specifically instructed the jury: "An employer may not discriminate against an employee because of the employee's race . . . ." And "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). We have no reason to doubt that the jury did so.

Joyner also argues that the jury being sent only two pages of the Code, without the Code's anti-discrimination employment policy, violated the Rule of Completeness. But what the jury asked for was the part of the Code that "grants authority to [the] Police Chief for appointments." And that's exactly what the court sent back to them. Under the Rule of Completeness, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Even assuming that the rule applies when a jury asks to see a specific part of a document, we don't think a district court abuses its discretion by not sending the jury more of a document than the jury asked to see, at least not when fairness does not require it to do so. And here it doesn't.

As we have explained, "after introduction of part of a document, Rule 106 does not automatically make the entire document admissible." *United States v. Mosquera*, 886 F.3d 1032, 1049 (11th Cir. 2018) (quotation marks omitted).  Instead, it allows "additional admissions from a writing . . . *when relevant and necessary to qualify, explain, or place into context the portion already introduced*." *Id.* (alteration adopted) (quotation marks omitted) (emphasis added). Given that the jury only requested to see the part of the Code giving the Police Chief the power to make appointments, the part stating that the chief was subject to anti-discrimination laws was not relevant or necessary to that request.  At least not where separate jury instructions had already instructed the jury that he was subject to them.  *See id.*

As we have mentioned, Joyner's counsel did not object to the improper remarks of opposing counsel during closing arguments.  He was in the courtroom, he heard the remarks, and he could judge for himself whether they were likely to sway the jury. He did object to some other parts of opposing counsel's remarks, but not to the remarks in question. And the judge clearly instructed the jury that an employer may not discriminate against an employee based on race.  The judge was there, heard the remarks, and had a better perspective than we do about their effect. Given all of the circumstances, the court did not abuse its discretion by not sending the jury more of the City Code provisions than it had requested, which is how the issue has been presented to us.

3.  Challenge to the Verdict Form

A mixed-motive Title VII racial discrimination claim, like the one that went to the jury in this case, has two elements: "(1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (alteration adopted) (quotation marks omitted). "An employee can succeed on a mixed-motive claim by showing that illegal bias . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* at 1235 (quoting 42 U.S.C. § 2000e–2(m)).

These are the first two questions as they appeared on the verdict form:

> 1. Do you find by a preponderance of the evidence that Defendant the City of Atlanta denied Terry Joyner an appointment to Captain on December 24, 2014?

> 2. Do you find by a preponderance of the evidence that Plaintiff Terry Joyner's race was a motivating factor in the City of Atlanta's decision not to appoint Joyner to Captain on December 24, 2014?

The jury answered "no" to the first question, so it did not reach the second one.

Before closing argument, Joyner had objected to the first question on the verdict form, asserting:

> [I]t does not reference in any way . . . that race was a factor in the denial of the appointment, which we

think is the very essence of Title VII, the race discrimination clause. It basically says was he denied an appointment, as though this is some sort of employment case . . . .

Counsel for the City responded that for a Title VII racial discrimination claim, "You first have to establish that there is an adverse employment action, and then as the second factor you look at whether race was a motivating factor in that adverse employment action." The court overruled Joyner's objection, and it rejected the same argument in his post-trial motion under Rules 50 and 59.

Joyner's argument to us is the same one he presented to the district court. He says that the first question on the verdict form is "completely divorced from controlling law because the question made zero attempt to ascertain, from the jury, the essential answer — regarding liability — of whether the jury believed race played a role / motivating factor in the decision [not] to appoint Joyner to the position of Captain." In his view, whether he would have been denied an appointment to captain despite any consideration of race is merely a defense through which the City might mitigate damages under the "same decision" rule.

The inquiry when verdict form interrogatories are challenged is whether the jury was misled, or whether the questions "accurately reflect the law." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1072 (11th Cir. 1996) (quotation marks omitted). It wasn't, and they do. Joyner had to prove two elements to prevail

on this claim. *See Quigg*, 814 F.3d at 1239. One was that the defendants denied him the promotion to captain in 2014. *Id.* Only if the jury had found he was denied the promotion would it have been called on to determine if race had been a motivating factor in that denial. *See id.* Logically, if there were no denial, race cannot have motivated the nonexistent denial. It makes no sense to ask what motivated something to happen that did not happen.

The district court did not err in rejecting Joyner's challenges to the verdict form at trial.

### 4. Motions for Judgment as a Matter of Law and for a New Trial

After Chief Turner testified at trial about how race factored into his employment decisions, Joyner moved under Rule 50(a) for judgment as a matter of law on liability for his Title VII claim. The court denied that motion. After trial, Joyner again moved for judgment as a matter of law on liability (now under Rule 50(b)) and for a new trial on damages under Rule 59, and the court again denied his motions.

Joyner contends before this Court that he was entitled to judgment as a matter of law as to liability on his Title VII racial discrimination claim. He says that Turner "testified, unambiguously, . . . [that he] reserved a certain number of seats for particular races, to the exclusion of all other races," so to Joyner there is "zero question" that the City had a practice of appointing officers that was motivated at least in part by race, in violation of Title VII. *See Quigg*, 814 F.3d at 1236, 1240 (explaining that for liability under Title

VII a protected category such as race must be a motivating factor for an unlawful employment practice but need not be the only motivating factor); 42 U.S.C. § 2000e–2(m).

A party is entitled to judgment as a matter of law on an issue when there is "no legally sufficient evidentiary basis" for a reasonable jury to find for the nonmoving party on that issue. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004); *see* Fed. R. Civ. P. 50. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Cleveland*, 369 F.3d at 1193 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)); *see also EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997) (explaining that judgment as a matter of law should be awarded to the party bearing the burden of proof "only when the evidence favoring [that party] is so one-sided as to be of overwhelming effect"). As for Joyner's motion for a new trial under Rule 59, a court may grant such a motion "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). We review the district court's denial of Joyner's Rule 59 motion for abuse of discretion. *EEOC v. W&O, Inc.*, 213 F.3d 600, 610 (11th Cir. 2000).

By focusing exclusively on his theory that Turner made an employment decision based on race, Joyner again ignores a necessary element he was required to prove to prevail under Title VII. The district court properly denied Joyner's motions for judgment

as a matter of law on liability because there was a legally sufficient basis for the jury to find that he did not suffer an adverse action. *See Quigg*, 814 F.3d at 1239.

To establish an adverse employment action for a Title VII discrimination claim, the plaintiff must either show an "ultimate employment decision . . . such as termination, failure to hire, or demotion," or demonstrate he "suffered a *serious and material* change in the terms, conditions, or privileges of employment." *Crawford*, 529 F.3d at 970–71 (quotation marks omitted).

When, as here, the purported adverse action is the employer's failure to promote, relevant considerations include whether the employee was "qualified" for the promotion but was rejected "despite qualifications." *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005); *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1434 (11th Cir. 1998) (concluding that the plaintiff had failed to make out a prima facie discrimination case under the Age Discrimination in Employment Act of 1967, "[b]ecause he was rejected so early in the decision making process, [he] has failed to demonstrate his qualifications for the job"). And where, as here, "an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate," the trier of fact can consider whether "the employer

60                    Opinion of the Court                    22-13728

had some reason to consider [the plaintiff] for the post." *See Vessels*, 408 F.3d at 768.[8]

There was sufficient evidence for a jury to find (as it did) that Turner did not take an adverse employment action against Joyner

---

[8] While Joyner is challenging a jury's verdict, *Vessels* and *Turlington* were decided at the summary judgment stage. *See Vessels*, 408 F.3d at 765; *Turlington*, 135 F.3d at 1437. In those two cases, we applied the *McDonnell Douglas* burden-shifting framework, *see Vessels*, 408 F.3d at 767–68; *Turlington*, 135 F.3d at 1432, which requires the plaintiff to make out a prima facie case, and then gives the defendant a chance to provide a legitimate, non-discriminatory reason for its decision. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). That framework does not apply in a mixed-motive discrimination case like this one, where an employer can be liable even if it was partially motivated by non-discriminatory purposes. *See Quigg*, 814 F.3d at 1236, 1240; *see also* 42 U.S.C. § 2000e–2(m). Anyway, once a "case [is] fully tried on the merits," it's irrelevant whether a plaintiff has made out a prima facie case; at that point, the *McDonell Douglas* framework "drops from the case," and the factual question is whether the employer took an adverse employment action against the plaintiff on the basis of a protected characteristic. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–15 (1983); *see Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1151 (11th Cir. 2005) ("After the defendant has met its burden of production by offering other legitimate reasons for its employment decision, however, the presumption raised by the prima facie case is rebutted, and . . . the presumption of discrimination that arose when the plaintiff made his prima facie showing drops from the case . . . .") (quotation marks omitted).

*Vessels* and *Turlington* provide insight on what factors a fact-finder can consider in this mixed-motive Title VII case because, like a plaintiff making a prima facie case for discrimination, Joyner was required to show he suffered an adverse employment action. *See Vessels*, 408 F.3d at 768; *Quigg*, 814 F.3d at 1239. Whether Joyner met that burden is informed by whether he was qualified for the job and whether the decisionmaker had reason to consider him. *See Vessels*, 408 F.3d at 768.

when he did not promote him to Captain in 2014. For one thing, the jury heard evidence that Joyner was not qualified because of various performance issues. He failed to appear for court when he was subpoenaed to testify against a criminal defendant. He disappointed his supervisors as the head of the fugitive squad by showing up at meetings unprepared, and he was ultimately removed from that position because of his performance. He was disciplined for sending an unprofessional and profane email from his work email account. He received a performance rating that Shields (Deputy Police Chief at the time) testified was "pretty much" the lowest evaluation that officers generally received. He gave his supervisor, Major Hobbs, the impression that he was arrogant (by preemptively refusing to run the criminal investigation division unit in Zone 2) and that he was not managing his staff efficiently (by reassigning all A sector officers to B sector and all B sector officers to A sector, causing a delay in response time). All of those instances of underperformance or malperformance easily could lead a jury to reasonably conclude that Joyner was not qualified for promotion to Captain. *See Vessels*, 408 F.3d at 768; *Turlington*, 135 F.3d at 1434.

Not only that, but Joyner never asked to be considered for a promotion. Chief Turner testified that open positions for Captain were "public knowledge within the police department." But Joyner never reached out to Turner to discuss his interest in a higher-ranked position. His apparent lack of interest and failure to take the initiative to obtain a promotion contrasts with another

Lieutenant who actively sought out and obtained a promotion to Captain.

That other Lieutenant testified that he proactively scheduled a meeting with Chief Turner to express his interest and go over his resume. He did get promoted to Captain under the same order that Joyner thinks should have resulted in him being promoted. Given Joyner's failure to put himself forward as a candidate, it is no wonder that Turner testified that Joyner was "never" under consideration for the promotion. Based on the evidence, a jury could rationally conclude the absence of a promotion was not an adverse employment action. *See Turlington*, 135 F.3d at 1434.

Additionally, of the four open Captain positions at the end of 2014, Turner's testimony supported a finding that only one was potentially "reserved" for a Black officer because the preceding officer was Black. That was the Zone 2 Captain position. But Joyner was already in Zone 2. And Turner testified without contradiction that he had a practice of moving new Captain appointees out of the Zones in which they had previously been working so they would not be supervising former peers. Joyner was aware of that practice. So there was evidence that Joyner (for reasons independent of his race) was never under consideration for an appointment to the one position that was potentially, under his theory of the case, reserved for a Black officer.

The jury determined that Joyner had not been denied a Captain appointment. We cannot say that that decision had "no legally

sufficient evidentiary basis." *Cleveland*, 369 F.3d at 1192. The district court did not err by denying Joyner's motion for judgment as a matter of law. And because Joyner lost on the issue of liability, it was no abuse of discretion for the court to deny his motion for a new trial on the issue of damages. *See W&O*, 213 F.3d at 610.

### III. CONCLUSION

We affirm the judgment of the district court, except that we reverse the part of it that granted summary judgment on qualified immunity grounds for Chief Turner and Major Hobbs on the First Amendment retaliation claim. We remand the case for further proceedings on that claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**